CITY OF TACOMA, DEPARTMENT
OF PUBLIC UTILITIES,
Plaintiff–Appellant,

v.

The UNITED STATES, Defendant–
Appellee.

No. 93–5183.

United States Court of Appeals,
Federal Circuit.

July 27, 1994.

George S. Karavitis, City of Tacoma, Department of Public Utilities, Tacoma, WA, argued for plaintiff-appellant. With him on the brief was Mark Bubenik.

Ellen M. McElligott, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for defendant-appellee. With her on the brief were Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Di-

rector and Sharon Eubanks, Asst. Director. Of counsel were Bryan R. O'Boyle and Major Terrie M. Gent, Air Force Legal Services Agency, Dept. of the Air Force, Arlington, VA.

Before ARCHER, Chief Judge, MAYER and LOURIE, Circuit Judges.

MAYER, Circuit Judge.

The City of Tacoma, Washington, appeals the judgment of the United States Court of Federal Claims, holding that the city's contract with the United States Air Force was valid and enforceable, and granting summary judgment for the government. 28 Fed.Cl. 637 (1993). We affirm.

## Background

On November 20, 1972, the City of Tacoma, Washington, and the United States entered into Air Force Contract No. F45603–73–C–0009 by which the city agreed to provide electrical services to McChord Air Force Base. The contract initially said that the government would be charged for service at rates specified in Rate Schedule E–4, which was attached to and made part of the contract. The contract also included a change of rates clause, which provides:

## 3. CHANGE OF RATES

At the request of either party to this contract with reasonable cause, the rates set forth herein shall be renegotiated and the new rates shall become effective as mutually agreed PROVIDED that any rates so negotiated shall not be in excess of rates to any other customer of the Contractor under similar conditions of service.

No increase shall be requested in the contract rate unless the Contractor has placed into effect a general rate increase to all of his customers under similar conditions of service. If the Contractor has placed into effect a ·general rate decrease, a corresponding decrease in the contract rate shall be made.

From 1973 to 1977, the parties executed nine rate changes by engaging in the negotiation procedures required by this clause. In each instance, agreement was reached which replaced the old rate schedule and incorporated the new rates into the contract.

In April of 1988, the city enacted Ordinance No. 24050 (effective April 20, 1988) which increased utility rates for Schedule E–2 [1] customers in two phases, April 10, 1988 through December 31, 1988, and January 1, 1989 through February 28, 1989. At the end of the second phase, the ordinance provided that governmental agencies would be grouped with other customers and charged under Schedule G, in effect establishing a third phase of increased rates. Although no modification to the contract was executed, the Air Force paid the new rates for two months beginning April 10, 1988. However, on July 27, 1988, the contracting officer notified the city that new rates would not be paid until mutually agreed upon as required by the change of rates clause.

The parties began negotiations. While the government agreed that the Schedule E–2 rates proposed for the first two phases were reasonable, it challenged any grouping under Schedule G because that schedule did not take into account differences in conditions among customers who owned and maintained their own distribution systems. On March 1, 1990, the government proposed a settlement by which it would pay rates (1) under Schedule E–2 for the period of April 10, 1988, through January 31, 1989, (2) under Schedule G for the period of February 1, 1989, through June 30, 1989, and (3) under the city's Schedule CP for the period of July 1, 1989 through April 2, 1990. This proposal offered a total payment of $611,336 for electrical service through March of 1990.

The city rejected the proposal and instead offered to settle for $678,000. The government objected that this amount represented too much of the contested charges and included "late charges" which were inappropriate because increased rates were not effective until the parties achieved mutual agreement on the increases.

On March 11, 1990, the city submitted a properly certified claim for $820,284.17 to the

1. By an earlier modification, the parties replaced    the Schedule E–4 rates with Schedule E–2.

contracting officer pursuant to the disputes clause which, via a 1980 modification, made the contract subject to the Contract Disputes Act of 1978. 41 U.S.C. § 601 *et seq.* (1988). The contracting officer issued a final decision on June 12, 1990, granting the city partial relief in the amount of $531,376.35 which represented the undisputed amount of the claim. The contracting officer unilaterally modified the contract to include the first two phases of the city's ordinance.

The city filed a second certified claim on September 24, 1990, seeking to terminate the contract because of the parties' failure to reach agreement over the rate changes. The contracting officer denied this request and directed the city to continue service in accordance with the contract. The city filed a complaint with the Court of Federal Claims.

The city raised a number of issues before the trial court, all pertaining to the validity of the contract. It argued that the contract (1) is contrary to a federal continuing appropriations act; (2) is contrary to state law; (3) contains latent ambiguities; (4) is illusory; and (5) is an invalid perpetuity. On summary judgment, the court rejected each of these claims, and the city appeals.

## Discussion

■ The gravamen of the appeal is the notion that the change of rates clause gives the government the right to "receive electric service at the old rate for as long as they wanted, or until the city capitulates," or gives the government "practical veto authority over utility rate adjustments." Because this issue of contract interpretation is central to most of the city's arguments, we address it first.

The change of rates clause was an original element of the contract when made in 1972. It provides that at the request of either party, the rates shall be renegotiated and the new rates shall become effective as mutually agreed. The city urges that this clause is merely an "agreement to agree" which permits the government to refuse to accept a new rate without consequence and is there-

fore illusory. We believe this is not a reasonable interpretation of the contract.

This court has recognized that a contract term which allows for future negotiation "impliedly places an obligation on the parties to negotiate *in good faith.*" *Aviation Contractor Employees, Inc. v. United States,* 945 F.2d 1568, 1572 (Fed.Cir.1991) (citations omitted) (enforcing a contract which required future negotiation of the contract price). There are also explicit standards which govern negotiations in this case. At a minimum, the change of rates clause requires the government to participate in negotiations, and the Department of Defense's own regulations, in effect when the contract was formed, require the contracting officer to negotiate in good faith and "determine[ ] whether the proposed increase is reasonable, justified, and not unjustly discriminatory." Armed Services Procurement Regulation, Supp. 5, § S5–110 (Sept. 1, 1968).

We think it clear, and the government concedes, that the contract and the applicable regulations require the government to negotiate in good faith and accept rate changes which are reasonable, justified, not discriminatory, and otherwise in accordance with the contract. These are sufficient standards by which a reviewing body can determine whether or not the government negotiated according to the contract. *See Aviation Contractor Employees,* 945 F.2d at 1573 (once factors that guide negotiations are determined, a trial court or agency board is "well suited" to determine whether an agreement is reasonable).

It is apparent that the city is not without recourse should the parties reach a stalemate. Pursuant to the contract's amended disputes clause, it may challenge an unsatisfactory negotiation by certifying a claim to the contracting officer and appealing a negative decision in accordance with the Contract Disputes Act.[2] So we reject the city's assertion that the change of rates clause allows the government to arbitrarily refuse to agree to rate changes without consequence and

2. The city's challenge to the validity of the dis-    putes clause is unavailing as discussed below.

continue to pay the old rates indefinitely, and that the clause is illusory.[3]

■ The city next contends that the contract is contrary to Washington state law and thus violates section 8093 of the Continuing Appropriations Act of 1987, which provides in relevant part:

> None of the funds appropriated or made available by this or any other Act with respect to any fiscal year may be used by any Department, agency, or instrumentality of the United States to purchase electricity *in a manner inconsistent with State law* governing the provision of electric utility service, including State utility commission rulings and electric utility franchises or service territories established pursuant to State statute, State regulation, or State-approved territorial agreements.

Pub.L. No. 100–202, § 8093, 101 Stat. 1329–44, 1329–79 (1987) (printed at note to 40 U.S.C. § 490 (Supp. V 1987)) (emphasis added). The city alleges that the contract violates two state provisions, one establishing the full rate making authority of the city,[4] and one providing that electric utilities must charge uniform rates to customers and that no customer may be given privileges which are not uniformly extended to other customers under like circumstances.[5] We do not need to speculate whether the contract's provisions inappropriately limit the city's author-

ity under state law because the Washington Supreme Court has addressed this issue.

In *Scott Paper Co. v. City of Anacortes,* 90 Wash.2d 19, 578 P.2d 1292, 1297 (1978), the court soundly rejected another city's argument that a contract which set fixed rates for water service violated the statutory requirement that the city have full authority over rates, stating that "the power to contract is an implied incident to the full power granted to regulate the use and distribution of municipal water." The court further held that the city's authority extended to the power to fix rates by contract. *Id.* at 1298.

The rate renegotiation provision in Tacoma's contract does not require an outcome different from *Scott Paper.*[6] The city does not argue, as it could not in light of *Scott Paper,* that it did not have the authority to contract with the government to provide electricity at a specific rate. Establishing new rates by modifying the contract, as the city and the government did many times before the current dispute, is an additional exercise of the city's right to set utility rates by contract, already condoned by the Washington courts. A provision permitting future renegotiation of rate changes does not per se violate state law.

The city says that the change of rates clause in its contract inappropriately removes rate making authority from the city council and gives it to the contracting officer with

---

3. The city's hypothetical also does not accurately portray the government's actions in this case. During negotiations, the government agreed to a number of the city's proposed rate hikes and has already paid those increased rates. It raised only two objections to the proposed rate change: that the third phase of the rate hike did not treat it like similar customers, a requirement recognized in both the contract and Washington state law; and that late charges were inappropriate. The government did not refuse to negotiate or reject all proposed rate changes.

4. A city or town may also construct, condemn and purchase, purchase, acquire, add to, alter, maintain and operate works, plants, facilities for the purpose of furnishing the city or town and its inhabitants, and any other persons, with gas, electricity, and other means of power and facilities for lighting, heating, fuel, and power purposes, public and private, *with full authority to regulate and control the use, distribution, and price thereof....*

Wash.Rev.Code § 35.92.050 (1990) (emphasis added).

5. No gas company, electrical company or water company shall charge, demand, collect or receive a greater or less or different compensation for any service rendered or to be rendered than the rates and charges applicable to such service as specified in its schedule filed and in effect at the time....

· · · · ·

No gas company, electrical company or water company shall extend to any person or corporation any form of contract or agreement or any rule or regulation or any privilege or facility except such as are regularly and uniformly extended to all persons and corporations under like circumstances.

Wash.Rev.Code § 80.28.080 (1962).

6. The city's attempt to distinguish *Scott Paper* on the basis that the contract there included a termination provision is unavailing because that was not a basis for decision in that case.

unfettered power to refuse a proposed rate increase. We have already rejected this interpretation. The city's rate making authority is limited only by the requirement that it not enact unjustified, discriminatory rate increases. We do not see how such a limitation deprives the city of its "full authority" to regulate the price of its services. Indeed, the state statute requires that rates not be discriminatory. Wash.Rev.Code § 80.28.080 (1962).

The city has not shown that the contract violates state law. Therefore, we need not reach the questions of whether McChord Air Force Base is a federal enclave with exclusive federal legislative authority and whether section 8093 of the Continuing Appropriations Act of 1987 is applicable.

■■■ The city next argues that the contract contains latent ambiguities. A contract is ambiguous when its language supports more than one reasonable interpretation. *Hills Materials Co. v. Rice,* 982 F.2d 514, 516 (Fed.Cir.1992). Most of the city's points about ambiguity distill to its pervasive argument that the change of rates clause can be read to grant the government unlimited discretion to refuse rate changes. Because the only reasonable interpretation of the change of rates clause is the one which preserves the validity of the contract—that the contracting officer is bound by standards of good faith and reasonableness—we conclude that the clause is not inherently ambiguous.

■■ The city's other discernable argument is that a latent ambiguity resulted from the 1980 amendment of the disputes clause because, in contrast to the previous disputes provision, the new one did not specifically provide for the resolution of rate disputes. It says that the amendment created an ambiguity because the contract no longer clearly stated how a rate dispute would be resolved if the parties failed to negotiate pursuant to the change in rates clause. The city further says this creates a conflict between the change of rates clause and the disputes clause.

This argument also fails. First, there is nothing on the face of the amended disputes clause that is ambiguous. The clause states, in relevant part:

(a) This contract is subject to the Contract Disputes Act of 1978 (41 U.S.C. 601, *et seq.*). If a dispute arises relating to the contract, the contractor may submit a claim to the Contracting Officer who shall issue a written decision on the dispute in the manner specified in DAR 1–314 (FPR 1–1.318).

There is only one possible interpretation of this clause—all disputes arising under the contract will be resolved according to the Contract Disputes Act.

■■■ Second, extrinsic evidence, including prior contracts with the government, may not be considered unless an ambiguity is identified in the contract language. *Sylvania Elec. Prods., Inc. v. United States,* 458 F.2d 994, 1005, 198 Ct.Cl. 106 (1972). Outside evidence may not be brought in to create an ambiguity where the language is clear. The 1980 amendment was mutually agreed upon and is clear on its face. No other evidence need be considered and terms of previous contracts are irrelevant because they were superseded by the new disputes clause.

The allegation that the Air Force acted surreptitiously in "sneaking" the new disputes clause into the 1980 modification, which the city characterizes as "principally a change of rate document," is baseless. In fact, the provision deleting the old disputes clause and inserting the new one comprised nearly half of the three page modification. The city was well aware of the modification's contents when it signed, and its after-the-fact protestations to the contrary are disingenuous. *See Reliance Ins. Co. v. United States,* 931 F.2d 863, 866 (Fed.Cir.1991) (contractor who enters into contract with full knowledge of its provisions must be bound by them).

■■ The city's last attempt to invalidate the contract pertains to the termination clause, which it characterizes as an invalid perpetuity. The clause provides that the contract shall continue until terminated at the option of the government with at least 30 days notice. The city cannot now raise this challenge because it was not included in its

certified claim to the contracting officer. Although the city requested termination in its second certified claim to the contracting officer, it described the basis for the request as a dispute over the payment of electrical services. It did not challenge the validity of the contract's termination clause. *See Reliance Ins. Co.,* 931 F.2d at 866 (no jurisdiction to consider a claim not submitted clearly and unequivocally to the contracting officer).

### Conclusion

Accordingly, the judgment of the Court of Federal Claims is affirmed.

*AFFIRMED.*