69 F.3d 554
 40 Cont.Cas.Fed. (CCH) P 76,865
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
METRIC CONSTRUCTORS, INC., Appellant,
v.
Daniel S. GOLDIN, Administrator, National Aeronautics and
Space Administration, Appellee.
 No. 95-1078.
 United States Court of Appeals, Federal Circuit.
 Oct. 20, 1995.
 
 Before NIES, LOURIE, and CLEVENGER, Circuit Judges.
 Opinion for the court filed by Judge CLEVENGER. Dissenting opinion filed by Judge NIES.
 CLEVENGER, Circuit Judge.
 
 
 1
 Metric Constructors, Inc. appeals from the August 5, 1994 Armed Services Board of Contract Appeals decision, Docket No. 46284, denying Metric an equitable adjustment for the installation of 84 drain trap primers. We reverse and remand.
 
 
 2
 * NASA hired general contractor Metric in February, 1991, to build a facility for NASA's Kennedy Space Center at a fixed price of $56,215,000. Metric subcontracted the project's plumbing aspects to Sauer, Inc. As with most plumbing projects, this project required that Sauer install traps in all drains. Traps are the U-shaped pipes at the bottom of the drain that provide a water seal in the drain pipe, thereby preventing sewer gases from rising up through the drain. Additionally, NASA required that Sauer install trap primers in some of the drains. Trap primers are devices that provide an independent water source for traps susceptible to evaporation. NASA and Metric, on behalf of Sauer, dispute the number of trap primers required by the contract.
 
 
 3
 Specifically, Metric contends that NASA made Sauer install 84 trap primers that the contract had not called for, and the cost for which Sauer had not included in its bid. Sauer installed these trap primers, per NASA's request, in open hub drains and in particular floor drains. Subsequently, in September, 1992, Metric submitted its certified claim in the amount of $65,692 for a "constructive change" to the contract. In February, 1993, the Contracting Officer issued his Final Decision denying the claim. Thereafter, Metric timely appealed to the Board.
 
 
 4
 The Board subsequently upheld the Contracting Officer's decision, concluding that NASA's desire for trap primers "was not as clearly expressed in the plain language of the specifications and drawings as it might have been, but we find it was stated with sufficient clarity." The Board based its opinion primarily on one specification drawing that required that the drains at issue be equipped with "1/2 [inch] primer connections", which the Board interpreted to mean that trap primers were required. In essence, the Board held that because a trap primer cannot be installed without a primer connection, a contractor seeing the requirement for primer connections would necessarily conclude that the government wanted trap primers to be installed at every drain location.
 
 II
 
 5
 Contract interpretation is a question of law, which we review de novo. C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1544 (Fed. Cir. 1993). We interpret a contract in accordance with its express terms and the plain meaning thereof. Id. at 1543. A contract term is ambiguous if there is more than one reasonable interpretation. Id. at 1544.
 
 
 6
 In the case at hand, we conclude that the contract is ambiguous regarding the placement of the trap primers in the drains at issue. The contract specifies that trap primers were to be provided "as indicated on drawings." But some of the drawings indicate that trap primers were not required. For example, "isometric" drawings M-163, M-164, and M-165 illustrate the placement of trap primers at particular floor drains, by using specific symbols for trap primers and the term "TRAP PRIMER", but not at other floor drains. And no trap primers are illustrated on the isometric drawings for open hub drains. In another "flow diagram" drawing, M-140, many rooms for which NASA ultimately required trap primers are not addressed in the drawing.[1]
 
 
 7
 The Government, however, relies on the "schedules fixture" drawing, M-073, which specifies that open hub drains and floor drains FD-1, FD-2, and FD-3 be equipped with, inter alia, 1/2 inch primer connections and standard deep seal traps.[2] M-073 does not, however, state that trap primers are required in these drains.[3] Nevertheless, the Government contends that the requirement for primer connections can only mean that trap primers were also required. Metric asserts that the requirement for primer connections is separate from the requirement for trap primers. Indeed, in this regard each party argues that there is no ambiguity in the contract, because each is convinced that it is completely right and that the opposing party is completely wrong. This posture bolsters our conclusion that an ambiguity exists. H & M Moving, Inc. v. United States, 499 F.2d 660, 670-71 (Ct. Cl. 1974).
 
 
 8
 Reviewing many elements in the contract, we conclude that Metric reasonably interpreted that the requirement for primer connections did not necessarily compel the installation of trap primers under this contract. As an initial matter, the drawings fail to specify trap primers at the drains locations at issue. Next, although M-073 specifies primer connections and deep seal traps, it does not specify trap primers. And although the term "connection" may suggest the function of connecting, the trap connection item as specified in M-073 is a device sold as an individual unit. Notably, Sauer apparently did not quibble with the requirement for primer connections at all drains because it routinely installs them at all drains in a given project,[4] and the Board noted that a "contractor might have reason to supply connections without trap primers to avoid field error." Such field error could only result if trap primers were required at some, but not all, drains.
 
 
 9
 Additionally, the Government has essentially conceded that at some point in time trap primers were not required at all of the drains at issue. In responding to Metric's assertion that M-140 did not specify the placement of trap primers, the Government said that the details in the drawings allowed for one trap primer to be connected to more than one drain, and thus "permitted the contractor the flexibility to determine the precise number and locations of the trap primers." NASA actually took that flexibility away from Metric when it required that the trap primers be installed at each and every drain.
 
 
 10
 Finally, the contract also requires compliance with the Standard Plumbing Code "except where the drawings and specifications require better materials and methods of installation than the minimum requirements set forth in the code[.]" The code requires that floor drains in the areas at issue here have either trap primers or deep seal traps. And indeed, M-073 calls for deep seal traps. Since the contract specifies that the code governs unless overridden by contract provisions requiring "better material and methods of installation," such contract provisions necessarily would have to emanate from the need for better materials or methods of installation than deep seal traps to prevent sewer gas release. Nothing in the contract indicates any greater needs than are satisfied by the specified deep seal traps. In short, the governing code specification can only be overridden by a clear and unambiguous contrary contract provision mandating the extra protection provided by trap primers. In light of these contract features, Metric concluded that where the drawings do not show trap primers, none were required. Metric's interpretation that the required presence of primer connections does not necessarily require installation of trap primers at all such connections falls within the zone of reasonableness, where our precedent dictates relief to the contractor:
 
 
 11
 [I]f some substantive provision of a government-drawn agreement is fairly susceptible of a certain construction and the contractor actually and reasonably so construes it, in the course of bidding or performance, that is the interpretation which will be adopted--unless the parties' intention is otherwise affirmatively revealed. ... Although the potential contractor may have some duty to inquire about a major patent discrepancy, or obvious omission, or a drastic conflict in provisions ... he is not normally required (absent a clear warning in the contract) to seek clarification of any and all ambiguities, doubts, or possible differences in interpretation. The Government, as the author, has to shoulder the major task of seeing that within the zone of reasonableness the words of the agreement communicate the proper notions--as well as the main risk of a failure to carry that responsibility.
 
 
 12
 WPC Enterprises, Inc. v. United States, 323 F.2d 874, 876-77 (Ct. Cl. 1963) (citations omitted). It thus follows from our precedent that "where the government draws specifications which are fairly susceptible of a certain interpretation and the contractor actually and reasonably so construes them, justice and equity require that construction be adopted." Peter Kiewit Sons' Co. v. United States, 109 Ct. Cl. 390, 418 (1947). When a contract's ambiguity is latent, even if both contracting parties have different reasonable interpretations of the ambiguity, the cost is charged against the government if the contractor establishes that it relied on its interpretation of the contract in bidding the contract. United States v. Turner Constr. Co., 819 F.2d 283, 286 (Fed. Cir. 1987).
 
 
 13
 A contract's ambiguity, however, may be sufficiently patent so that the contractor has a duty of inquiry before submitting a bid. In that case, the cost of the ambiguity may not be charged against the government. A patent ambiguity is one that is "obvious, gross, glaring, so that [the] plaintiff contractor had a duty to inquire about it at the start." H & M Moving, 499 F.2d at 671. Here, the contract poorly expresses the wishes of the Government. The presence of the code compliance requirement, and the criteria necessary to supplant the code, preclude any notion that a patently ambiguous hole had been left in the contract by its draftsman. In the circumstances here, the ambiguity lacks the required glaring quality, Beacon Constr. Co. v. United States, 314 F.2d 501, 504 (Ct. Cl. 1963), and instead comfortably exhibits its latent character. Further, the Government does not dispute that when Sauer prepared its bid, it relied on its interpretation that trap primers were not required at the drains at issue. In this instance, Metric's reasonable interpretation of the contract must be viewed as a constructive change. Sanchez & Son, 6 F.3d at 1544. Therefore, we reverse the Board's denial of Metric's claim for a constructive change, and remand the case for a final determination of quantum.
 
 
 14
 NIES, Circuit Judge, dissenting.
 
 I.
 
 15
 Assuming, arguendo, that the contract is ambiguous, we must still apply an established standard of review to scrutinize the underlying factual determinations made en route to interpreting the contract. C. Sanchez and Sons, Inc. v. United States, 6 F.3d 1539, 1544 (Fed. Cir. 1993). Having held that the contract is ambiguous, a tribunal appropriately may look to extrinsic evidence to ascertain its meaning. Our review of the Board's findings regarding the extrinsic evidence is not, however, de novo but is whether its findings are supported by substantial evidence. 41 U.S.C. Sec. 609(b) (1988); Sanchex, 6 F.3d at 1544; Fruin-Colnon Corp. v. United States, 912 F.2d 1426, 1438-29 (Fed. Cir. 1990).
 
 The Board found that:
 
 16
 As a matter of standard industry practice, plumbing system designers do not require drains with primer connections at an additional expense that would permit connection to a trap primer in locations where the connection was not required. Without more we do not consider it logical to expect the Government to require optional features in plumbing fixtures for the sole purpose of minimizing field installation error by suppliers.
 
 
 17
 In re Metric Constructors, Inc., No. 46284 (ASBCA August 8, 1994) at p 11. The Board based this finding on affidavits. Although Metric challenges the qualifications of the affiants and cites its own affidavits with opposite conclusions, we cannot seriously maintain that the Board's finding on this issue was capricious or unsupported by substantial evidence. Johnson & Gordon Security, Inc. v. GSA, 857 F.2d 1435, 1438 (Fed. Cir. 1988) ("[E]ven though the record may contain evidence which supports a contrary position, we will not alter a board's finding if substantial evidence supports it." (citation omitted)). The majority does not overturn the Board's factual finding quoted above, yet somehow that finding vanishes from this appeal and the majority imposes the converse finding.
 
 II.
 
 18
 I would hold that the contract is unambiguous and affirm the judgment for the following reasons. The term "trap primer" does not necessarily mean a trap primer valve. Drawing M-140 unquestionably permits a single trap primer valve to feed multiple drain traps. Equating the term "trap primer" with "trap primer valve" is erroneous.
 
 
 19
 The majority quotes the Board as stating that a "contractor might have reason to supply connections without trap primers to avoid field error," but this out-of-context quote grossly distorts the Board's reasoning. The Board placed the word "although" before the quote and ended the sentence by stating, "it is unreasonable to expect the Government to impose a requirement to supply connections at additional cost that were unnecessary." Metric, supra, at p. 8. A contractor might initially expend additional resources to eliminate the possibility of subsequent errors that would be more expensive to correct later or a contractor might estimate its bid proposal by calculating its bid as if additional materials were required to cover field errors, but it is manifestly preposterous to believe that the government would solicit bids on items neither required nor desired.
 
 
 20
 As additional support for finding the contract ambiguous, the majority states that Schedule Fixtures Drawing M-073 does not state that trap primers are required in the drains nor does it specify trap primers. These are odd statements given that the contract at clause 2.2.2.9 explicitly identifies the specific brand and model number (or its equivalent) of the trap seal primer valve required. Moreover, the schedule merely provides a roster of parts and supplies. The schedule does not teach a reader to connect together the different fixtures. Common sense would dictate that if the contract specified two commonly used fixtures that are normally connected during field installation, a reasonable person would have little problem understanding that connection was required.[1] Obviously, even an amateur plumber would conclude that a drain with a primer tap would be connected to a primer. The majority's reasoning on this point completely escapes me.
 
 
 21
 The majority also reasons that the standard plumbing code, which the contract incorporated as a minimum standard, somehow supports Metric's contention. The code states that non-toilet area drains require either a deep seal trap or a trap primer. However, Schedule Fixtures Drawing M-073 negates the code option. Drawing M-073 required the drains to have both deep seal traps and trap primer connections. Requiring both features on the drains eliminated the option of using either. Under the majority's reasoning, the option still existed, which necessarily indicates that the trap primer connection requirement on the drains were superfluous.
 
 
 22
 Because adopting Metric's interpretation would be unreasonable and defy common sense, I would affirm the Board's holding that the contract is unambiguous and that the contract required Metric to install trap primers. A court can declare a contract ambiguous if two reasonable interpretations may be made. Here, the parties offer one reasonable and one unreasonable interpretation.
 
 III.
 
 23
 If this contract is ambiguous on its face, then the ambiguity was patent requiring Metric to seek clarification prior to submitting its bid. Newson v. United States, 676 F.2d 647, 650 (Ct.Cl. 198). In its brief to this Court, Metric analogized this dispute to a situation where a contract called for installation of an electrical outlet for an air conditioning unit. Metric asserts that it would only have to provide an outlet, not an air conditioning unit. While that might be true, the analogy is inapt. A better analogy would be if the contract required outlets containing a telephone receptacle and a receptacle for television cable, but that other drawings showed only some of the outlets connected to television cable. In that situation, a contractor would obviously be put on notice that either it had to connect all the outlets to television cable or that the government did not intend to require all the outlets to have the considerably more expensive telephone/television receptacle combination. A prudent contractor would seek clarification prior to bidding. Likewise here, Metric knew that the government wanted the more expensive drain with the primer connection, but now claims that requiring the primer connection was merely superfluous.
 
 
 24
 While Metric's arguments have a ring of reasonableness, the evidence underlying counsel argument contradicts the arguments. The majority accepts Metric's argument that if a trap primer was not shown on the isometric drawings, then Metric reasonably believed that it did not have to install trap primers.[2] In its brief before this Court, Metric boldly states that unless a trap primer is indicated on the isometric drawings for a particular drain, the contract did not intend to require Metric to install trap primers. The examples below belie Metric's broad assertion. Further, depending on which drains are at issue, Metric adopts contradictory positions concerning the drawings. A few examples below will suffice.[3]
 
 Toilet Rooms 1055, 1510, 1064 and 1423
 
 25
 Metric argued before the Board that it should also be compensated for installation of trap primers in four toilet areas because the drawings did not show trap primers for those drains. Isometric Drawing M-164 shows that a trap primer is required on the floor drain for room 1054, but not for the floor drain in room 1055. Originally Metric argued that the drawings did not require it to install the trap primer for Room 1055, but Metric dropped its demand for compensation. This only highlights that the drawings did not show all the trap primers that were required and that Metric unreasonable relied on isometric drawings, instead of looking to all the drawings and specifications.[4]
 
 Mechanical Equipment Room 2019
 
 26
 Metric installed trap primers for nine drains (6 OHDs and 3 FD-2s) in Room 2019, but seeks compensation for only eight drains.[5] Drawing M-140 (Potable Water) specifies a type A trap primer arrangement. Isometric Drawing M-165 illustrates no OHDs and 3 FD-2s, none with any indication for trap primers. Elsewhere on Isometric Drawing M-165, some drains are marked as requiring trap primers.
 
 
 27
 Metric states that it interpreted the drawings to mean that it need only install one trap primer on one of the FD-2 drains. That reasoning on its face is fallacious. The only indication that trap primers were required in Room 2019 is the type A note on Drawing M-140. Drawing M-140 unequivocally indicates that type A arrangements are "for toilet areas only." The drawings clearly put Metric on notice that Room 2019 was not a toilet area, yet prior to submitting its bid, Metric never sought clarification as to the requirement for trap primers.
 
 
 28
 Further, Metric takes the illogical position that it could install one trap primer on one FD-2 drain and leave eight drains with only the deep seal traps. Why NASA would randomly request only one trap primer (and a type A trap primer for a non-toilet area) and why Metric thinks it is reasonable that it could arbitrarily choose which of the nine drains should receive the trap primer is unanswered. Moreover, Isometric Drawing M-165 does not contain any notation that Room 2019 required trap primers, yet Metric believes it was required to install one. Metric's main argument is that the isometric drawings misled them into believing that trap primers were required only at locations where trap primers were indicated on the isometric drawings. Room 2019 fits that category, but Metric admits that it had to supply at least one trap primer.
 
 
 29
 Metric concedes that its main contention, that the isometric drawings should control, is untenable.
 
 Mechanical Equipment Room 3002
 
 30
 Metric installed trap primers for ten drains (6 OHDs and 4 FD-2s) in Room 3002, but seeks compensation for only five drains. Before the Board, Metric interpreted Isometric Drawing M-165 to require a trap primer at one of the OHD drains. This acknowledgement is in marked contrast to its argument before this Court, accepted by the majority, that the isometric drawings never indicate a trap primer for any OHD. Metric goes further in its argument to this Court, stating, "Nowhere were OHD's shown connected to trap primers."[6]
 
 
 31
 Drawing M-140 (Potable water) specifies a type B arrangement for the trap primers. Isometric Drawing M-165 illustrates four FD-2s and one OHD, with only one FD-2 connected to a trap primer (although Metric stated in its brief to the Board that a note on M-165 required five drains to be connected to trap primers).
 
 
 32
 Undoubtedly, a reasonable reading of the drawings would have, and did in this case (at least for a while), put Metric on notice that some of the OHD drains required trap primers. Why the majority accepts Metric's current argument that no trap primers were required for any OHDs is a mystery.
 
 
 33
 Once again, Metric asks this Court to believe it is reasonable that NASA would require only one of the six OHDs to be connected to a trap primer and would even leave it to Metric's discretion to choose which one to connect. At the same time, five other OHD drains would be installed with threaded trap primer connections for hook-up but left unconnected. According to Metric, a reasonable contractor would not think it was necessary to install the necessary piping to make the connection. That contention defies credibility.[7] At a bare minimum, Metric had notice at the time the bids were solicited that the drawings did not indicate all the connections to or the number of trap primers.
 
 Mechanical Equipment Room 3022
 
 34
 Metric installed trap primers for three drains (2 OHDs and 1 FD-2) in Room 3022, but seeks compensation for two drains. A type B trap primer arrangement is specified on Drawing M-140. Isometric Drawing M-165 illustrates no OHDs and one FD-2 without any indication for trap primers. Elsewhere on Drawing M-165, some drains are marked as requiring trap primers. Metric interpreted the drawings to require one trap primer on the one FD-2 drain.
 
 
 35
 This interpretation for this room also raises questions. Drawing M-140 indicates that the primer arrangement for this room can be used for multiple drains, yet Metric chooses only to make the connection to the one drain. Two other drains with trap primer connections would have been left unconnected. Further, the isometric drawing does not indicate that a trap primer is required, but Metric was willing to install a trap primer for one drain. Metric found that requirement in drawings other than the isometric drawing, yet argues on appeal that the isometric drawings should control.
 
 Mechanical Equipment Room 1038
 
 36
 Metric installed trap primers for three drains (2 OHDs and 1 FD-2) in Room 1038, but seeks compensation for two drains. Drawing M-140 (Potable Water) specifies a type B trap primer arrangement. Isometric Drawing M-164 illustrates a single FD-2 drain without any primer connection.
 
 
 37
 Metric intended to supply one trap primer for the single FD-2 drain located in Room 1038. Similar to the other examples listed above, the isometric drawings do not show any trap primers for this room, but Metric interpreted other drawings to require it to install at least one trap primer. This reasoning contradicts its absolutist position in its briefs that the isometric drawings control. Here, the potable water drawings clearly informed Metric that trap primers were required. With a type B primer arrangement, Metric should have considered whether the two other drains in the room required connection. If Metric attempts to retreat to its appellate argument that the drawings never show OHDs with trap primers, then Metric's own admissions concerning Room 3002 refute that contention.
 
 
 38
 The above examples demonstrate that Metric's current arguments are contrived for appeal and that when preparing its bid, Metric negligently failed to seek any clarification of the glaring inconsistency in its own interpretation of the documents. Chris Berg, Inc. v. United States, 455 F.2d 1037, 1045 (Ct.Cl. 1972) ("it is not the actual knowledge of the contractor, but the obviousness of the discrepancy which imposes the duty of inquiry"). Metric attempts unreasonably to isolate individual contract documents instead of looking to all the documents as a whole.
 
 
 39
 If this contract is ambiguous, then the defects were patent, which placed the burden of inquiry on Metric. Since Metric failed to seek clarification, it should be held to the contract as interpreted by the Board.
 
 
 40
 Last, if the defects are considered latent, then Metric unreasonably interpreted the contract. Given that Drawing M-140 clearly indicated that multiple traps may be fed by a single primer valve and that the government does not request unneeded items in bid solicitations, no reasonable contractor could interpret the contract as Metric insists.
 
 IV.
 
 41
 The majority's remedy, reversing the denial of a claim for constructive change and remanding for determination of quantum, prematurely terminates adjudication on the merits. The Board held that Metric was not entitled to compensation because the contract called for trap primers to be connected to all the drains. The majority, by fiat, announces that Metric had to install a primer valve for every drain. The record does not support that appellate fact finding. NASA merely required Metric to fulfill the contract as written which allowed Metric the discretion to use one primer valve for multiple drains in certain locations. Nothing in the record shows the contrary.
 
 
 42
 In one example in Metric's brief to the Board, Metric indicates that it seeks compensation for the installation of a trap primer at two OHDs in a particular room. Elsewhere in that brief, Metric seeks compensation for multiple trap primers for multiple drains. Whether Metric improperly installed too many valves where it could have installed only one is not before us, but the majority's remedy terminates adjudication on the merits. On the record presented to this Court, we are simply unable to determine whether the Board reached these considerations.
 
 
 43
 Under the majority's interpretation of the contract, vacating and remanding would be the proper remedy.
 
 
 
 [1]
 The contract schedule includes Article 2, "CONTRACT DRAWINGS, MAPS AND SPECIFICATION (FEB 1990)," which required that the work conform to the specified contract drawings, maps and specifications. Although the specification warned against literal reliance on the drawings, the caveat against such reliance addressed, inter alia, "details of work manifestly necessary" that might not be shown on the drawings. The specification also stated that drawings did not show "all off-sets, elbows, or other specific elements required for proper installation." The Government has not explained why the primers were manifestly necessary or why proper installation mandated the installation of trap primers
 
 
 [2]
 Deep seal traps are simply enlarged U-shaped traps that hold greater amounts of water in the trap than conventional traps. Such deep seal traps provide a greater guard against evaporation of water standing in the trap
 
 
 [3]
 For example, regarding "FD-2" floor drains for heavy duty mechanical rooms and unfinished areas, M-073 required:
 TWO PIECE COATED CAST IRON LEVELEZE FLOOR DRAIN, WITH DOUBLE DRAINAGE FLANGE [WEOLOC] NON-PUNCTURING FLASHING COLLAR, WEEPHOLES, NO-HUB BOTTOM OUTLET CONN. ROUND TOP, ADJUSTABLE COLLAR WITH ROLLED THREAD AND DEEP SET TRACTOR GRATE AND 1/2"' PRIMER CONN. AND STD. C.I. [cast iron] DEEP SEAL TRAP.
 JOSAM SERIES 31600-Y-50 OR EQUAL.
 
 
 [4]
 Having determined that the contract is ambiguous, we consider this type of extrinsic evidence bearing on Metric's reasonable interpretation of the ambiguity. City of Tacoma, Dep't of Pub. Utils. v. United States, 31 F.3d 1130, 1134, (Fed. Cir. 1994)
 
 
 [1]
 Under the majority's purported logic, a contractor reading Drawing M-073 would not be required to connect a urinal, specified in M-073, with a water source or waste system, because the parts list does require a connection
 
 
 [2]
 The isometric drawings illustrate the waste plumbing system. In contrast, Drawing M-140 illustrates the potable water supply. One problem present with the drawings is that the trap primer systems originate in the potable water system, but terminate in the waste plumbing system. If the systems (potable and waste water) are drawn separately, the entire trap primer system (value, connecting pipe, connection point in drain) cannot be indicated solely on the waste plumbing nor the potable water system. A plumber must look to both sets of drawings
 
 
 [3]
 Before the Board, the parties each submitted a room-by-room analysis in their respective briefs. Portions of those briefs were included in the joint appendix submitted to this Court. Metric specifically relies on the room-by-room analysis in its brief to this Court
 Below is a portion of drawing M-140 which shows the two different arrangements for trap primers. Type A is used only for toilet areas and requires one trap primer per drain. Type B is used elsewhere and allows one trap primer to be hooked to multiple traps.
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 [4]
 Although before the Board Metric dropped its demand for compensation for installing a trap primer in Toilet Room 1510, Metric attempts to use isometric drawing of Toilet Rooms 1509 and 1510 to demonstrate NASA's unreasonableness. Considering the fact that Metric admits that drawings and specifications in the contract other than the isometric drawings required Metric to install trap primers in Room 1510, that should estop Metric from continuing to argue that only the isometric drawings would have alerted a reasonable contractor to the need to install trap primers
 
 
 [5]
 Open hub drains are abbreviated OHD, and floor drains are abbreviated FD. The number following the floor drain is not relevant to this appeal
 
 
 [6]
 Metric further argues that "Every Project drawing illustrating trap primers shows them connected to floor drains, not open hub drains." (emphasis in original). Drawing M-142 at zone G-7 illustrates an OHD with a trap primer connection
 
 
 [7]
 Curiously, the majority finds that the trap primer connections on the drains are a separate item sold as an individual unit. The record belies that appellate fact finding. The Board noted that the connection was "the threaded hole in the drain to which piping could be connected if a trap primer were required to be connected to the drain." Further, a catalog illustration provided in the joint appendix shows the connection to be nothing more than a hold in the side of the drain. Last, an affidavit supplied by Metric states that the trap primer connection is nothing more than a threaded aperture