NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2007-1054

THOMAS CREEK LUMBER AND LOG COMPANY,

Appellant,

v.

Dirk Kempthorne, SECRETARY OF THE INTERIOR,

Appellee.

Kevin R. Garden, The Garden Law Firm, P.C, of Alexandria, Virginia, argued for appellant.

Reginald T. Blades, Jr., Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for appellee. With him on the brief were Peter D. Keisler, Acting Attorney General, and Jeanne E. Davidson, Director.

Appealed from: United States Department of the Interior Board of Contract Appeals

Administrative Judge Candida S. Steel

NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2007-1054

THOMAS CREEK LUMBER AND LOG COMPANY,

Appellant,

v.

Dirk Kempthorne, SECRETARY OF THE INTERIOR,

Appellee.

_____

DECIDED:  October 3, 2007

_____

Before RADER, BRYSON, and PROST, Circuit Judges.

RADER, Circuit Judge.

The Department of the Interior Board of Contract Appeals (IBCA) decided that Thomas Creek Lumber and Log Company (Thomas Creek) is not entitled to compensation for deterioration of timber between 1991 and 1995.  Appeals of Thomas Creek Lumber and Log Company, IBCA No. 3917R-3921R-2005, 06-2 BCA ¶ 33,342 (July 20, 2006).  Because no contract existed before October 26, 1995, this court affirms.

I

On September 11, 1991, the Board of Land Management (BLM), offered for sale timber within an area known as Rocky Road in the state of Oregon.  Although it was the highest bidder, Thomas Creek was not immediately awarded the timber contract.

Instead, the BLM delayed 4 years due to questions regarding Thomas Creek's ability to pay as well as the requirement for consultation under the Endangered Species Act to protect spotted owl habitat. On Jan 30, 1992, the habitat requirement halted the sale. In 1994, BLM formally cancelled the sale.

The Rescissions Act, on July 27, 1994, intervened to require BLM to award certain timber sale contracts, such as the Rocky Road contract, to the previously designated highest bidders "with no changes in originally advertised terms, volumes and bid prices." Pub. L. No. 140-19; 109 Stat., 1995. Accordingly, the BLM offered the contract to its highest bidder from 1991, Thomas Creek. The BLM clarified that Thomas Creek had no obligation to accept the award because over 90 days had elapsed since the bid.

In July of 1995, Thomas Creek conducted another inspection and found that additional damage had occurred to the site since 1991. Nonetheless, and knowing that it had no obligation to enter into the contract, on October 26, 2005, Thomas Creek accepted the contract in its original form.

Over the next three years (1995-1998), BLM modified the contract price several times to account for deterioration of the timber on the site. The final purchase price agreed to by BLM was $716,262, which was lower than the original contract price. Thomas Creek, still dissatisfied, sought from the Contracting Officer (CO) additional compensation for damage to the timber. The CO increased BLM's liability by $55,973. Thomas Creek wanted more, $286,164, and therefore appealed to the IBCA.

On May 18, 2005, the IBCA determined that Thomas Creek was not entitled to any compensation for the deterioration of timber between 1991 and 1995. The IBCA

determined *sua sponte* that no contract bound the parties until October 26, 1995. Therefore, the Board did not award Thomas Creek any compensation for damage to the timber prior to that time. After additional briefing on reconsideration, the Board sustained its holding. Thomas Creek now appeals.

II

Section 6 of the contract specifies that Thomas Creek accepts the timber after its examination in "*as is*" condition:

Sec. 6. <u>Inspection of Timber and Disclaimer of Warranty</u>:

(a) Purchaser warrants that this contract is accepted and executed on the basis of its examination and inspection of the timber sold under this contract and its opinion of the value thereof.

(b) Government expressly disclaims any warranty of fitness of the timber for any purpose, all timber sold hereunder is accepted *As Is* without any warranty of merchantability by Government. Any warranty as to the quantity or quality of the timber sold hereunder is expressly disclaimed by Government…. (emphasis in original).

Section 6(a) of the contract shows that Thomas Creek accepted the contract based on its own examination of the site. Thomas Creek examined the site not only in 1991 before it submitted its bid, but also again in 1995 before signing the contract. Thomas Creek also knew that it had no obligation to accept the contract. Thus, knowing of the changed circumstances on the site, Thomas Creek chose to sign and accept the contract in its original form. Moreover section 6(b) of the contract expressly disclaims any warranty on the quantity or quality of the timber.

Thomas Creek argues that contract does not specify the point in time to which the "*As Is*" condition refers. Because "as is," by its terms, refers to the present tense, the Board reasoned properly that "*As Is*" means "*As Is*" at the time of contract entry. [RB 12]. As the Court of Claims expressed in its analysis of an identical disclaimer, "[i]t is difficult to imagine how the disclaimer could have been any clearer." Webco Lumber Inc. v. The United States, 677 F. 2d 860, 863 (Ct. Cl. 1982).

Thomas Creek refers to the behavior of the parties as evidence that the contract had a different meaning. Thomas Creek notes that the CO behaved as if the government was liable for some of the damage that occurred prior to the signing of the contract. Thomas Creek argues that the CO, apparently, believed that the contract allowed payment of lost quantity and quality value from date of its original bid. The conduct of the parties, however, is not necessary or, even relevant to interpret an unambiguous contract. As this court has stated, contract terms "phrased in clear and unambiguous language. . . must be given their plain and ordinary meaning, and we may not resort to extrinsic evidence to interpret them." Coast Federal Bank v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (quoting McAbee Constr. Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996)). This court has considered extrinsic evidence in order to discern the presence of an ambiguity in contract terms, but in this case, the evidence presented does not demonstrate that Thomas Creek reasonably relied on a competing interpretation of "*As is*" when it entered into the contract. See Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin., 169 F.3d 747, 751-52 (Fed. Cir. 1999) (trade practice and custom examined when party relied upon competing interpretation at contract formation); Beta Sys. Inc. v. United States, 838 F.2d 1179,

1183 (Fed. Cir. 1988). Because the disclaimer of warranty in section 6 of the contract as to the fitness, quality, and quantity of the timber was unambiguous, this court declines to examine the extrinsic evidence pointed to by the appellant. City of Tacoma v. United States, 31 F.3d 1130, 1134 (Fed. Cir. 1994) ("[E]xtrinsic evidence . . . may not be considered unless an ambiguity is identified in the contract language.").

Section 7 also does not place the risk of loss on the government for damage that occurred prior to the formation of the contract:

Sec. 7. Passage of Title  and Risk of Loss:

Title to timber sold under this contract shall remain in Government and shall not pass to Purchaser until such timber has been paid for and removed from the contract area. Unless cut timber is sold under this contract risk of loss shall be borne by Purchaser after the timber is cut: Provided, however, that if loss results from a fire that was not caused by Purchaser, his contractors, subcontractors, or the employees of any of them, the risk of loss shall be borne by the party holding title. Risk of loss to Government shall not exceed the value of such timber computed at the prices per unit for the species involved as set forth in Exhibit B.  As used in this section, the term cut timber refers only to timber which has been felled, bucked, or otherwise severed by direct human activity prior to the date this contract was entered into.

Generally, a government contract must be in writing and signed by the parties before it binds them. American General Leasing, Inc. v. U.S., 587 F.2d 54 (1978).  In particular, for timber contracts such as that at issue, 43 C.F.R. § 5424.0-6(b) provides:

The severance and or removal of any vegetative resource for personal or commercial use requires a written contract or permit issued by the authorized officer or other person authorized by the United States. All contracts shall contain the following:

> (1) The name of the purchaser…

> (2) <u>Signature of the purchaser</u> (emphasis supplied).

Thomas Creek argues that section 7 provides that the BLM bore the risk of loss until the timber was cut. Indeed, this section does place the burden on the BLM for any damage that occurred between the execution of the contract and the time of timber cutting. Nothing within section 7, however, indicates that the risk of loss provisions apply to any events before existence of the contract. As noted, the parties entered the contract in 1995. Thomas Creek's reliance on section 7 is misplaced.

III

Because the terms of the contract were clear that the purchaser based its decision on its inspection as required by section 6(a) and accepted the merchandise "*As Is*," this court affirms the decision of the IBCA that no contract was in existence before October 26, 1995.

<u>AFFIRMED</u>

<u>COSTS</u>

Each party shall bear its own costs.