LaSALLE PARTNERS, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 99–763C.

United States Court of Federal Claims.

March 9, 2001.

Roy Niedermayer, Bethesda, MD, for plaintiff.

Kyle Chadwick, Washington, DC, with whom was David W. Ogden, Assistant Attorney General, for defendant. Martin Hom, General Services Administration, of counsel.

## OPINION

FIRESTONE, Judge.

This case arises over a contract entered into in 1997 between the United States General Services Administration ("GSA"), LaSalle Partners ("LaSalle"), and, subject to dispute, Moore & Associates, Inc. ("Moore"). The contract was for the purpose of providing asset management and development services to the government in connection with a plan to convert the former Naval Surface Warfare Center in White Oak, Maryland into a campus for the Food and Drug Administration ("FDA"). Under the terms of the contract, a "public-private partnership" was formed to perform the work in two phases. Phase I called for creation of a business plan and negotiation of a proposed development agreement. Phase II provided the government with an option to proceed with the

development using the business plan. In the end, GSA and FDA did not go forward using the business plan that was produced by La-Salle and Moore in Phase I of the contract. Instead, the government proceeded with the development on its own, without the assistance of a private "partner." As a result, LaSalle and Moore claim that the government breached their contract in numerous ways. In their seven-count complaint, La-Salle and Moore seek damages of $61 million.

This action comes before the court on the government's motion for dismissal of plaintiff Moore and for partial summary judgment. The government seeks to dismiss Moore on the grounds that Moore was LaSalle's subcontractor and was never in privity with the government. The government also moves for partial summary judgment on plaintiffs' claims for breach and damages arising from the government's decision not to use plaintiffs' services for the development of the White Oak site. The government contends that because it did not exercise its development option under Phase II of the contract, it never agreed to have plaintiffs develop the site and thus the government is not liable for lost development fees and profits associated with Phase II of the contract. For the same reason, the government argues that it is not liable for development-related damages arising from abrogation of the alleged "private-public partnership" with plaintiffs.

For the reasons that follow, the court **GRANTS** the government's motion to dismiss plaintiff Moore and for partial summary judgment.

## FACTS

### A. Background

#### 1. The solicitation

The following facts are undisputed unless otherwise noted. On May 14, 1997, GSA released the final solicitation seeking private

offerors to create a plan for the development of a consolidated headquarters for FDA upon the former site of the Naval Surface Warfare Center in White Oak, Maryland.[1] The publication of the final solicitation followed the release of a draft request for proposals and a draft solicitation. In addition, a pre-proposal conference was held on April 3, 1997.

The final solicitation, "A Public–Private Partnership Opportunity," described the plan envisioned by GSA for the White Oak site: a developer would be chosen to provide development, management and other services for the new FDA headquarters. Because conventional federal funding was not available at the time, GSA planned to "explore with the developer all opportunities and approaches with respect to financing for some or all of the project costs."[2]

The solicitation identified a two-step process for the development of the White Oak site. As set forth in the Scope of Work, the awardee was to formulate a "business plan for the project." The solicitation provided that "the business plan (and all other written products) are works made for hire and are the property of the government." After approval of the business plan, the Scope of Work provided for a "Project Implementation Option." The Scope of Work went on to state: "The government, at its sole discretion, may exercise the option to proceed with the project in accordance with the business plan .... If the government exercises the option, the developer, working with the government will implement the business plan and will provide all support necessary [for the project]."

The solicitation summarized the acquisition process as follows:

. . .

f. The developer will prepare draft portions of the business plan for review during the period of due diligence. . . .

---

1. Solicitation No. GS–11P97MMC0020.

2. The projected cost for the entire White Oak project was $350 million, and as of May 1997, approximately $27 million had been appropriated for the project, of which $19 million was still available. But this $19 million was not technically "available" to the project, because Congress

had not yet authorized GSA and FDA to proceed beyond the business plan Phase I of the project. The final solicitation explained: "Federal funding for the balance of the project is not now available. However, federal funding may be requested upon completion of the business plan."

g. The government will have the option to negotiate with the developer a development agreement for the purpose of implementing the business plan....

h. If the government so elects, the developer will proceed with implementation of the strategy contained in the business plan.

i. The selected developer, with full participation by the government, will conduct a competitive process for selection of ... contractors....

j. The government intends that its relationship with the developer will be one of mutual cooperation and benefit; a relationship sometimes now commonly referred to as a "public-private partnership."

Under the terms of the solicitation, the government agreed to pay the developer "a firm fixed price of $200,000 upon the completion of the business plan to the reasonable satisfaction of the Contracting Officer." With respect to implementation of the project, the solicitation provided that, "any fee for the project implementation phase will be negotiated between the government and the developer." In the Price Proposal section, the solicitation next provided that any proposal should include a discussion of "fee expectations." Under this section of the solicitation, the government provided:

The developer should discuss its fee expectations for the option phase (i.e. proceeding with the project (*at the government's option*) in accordance with the business plan).... Fee negotiations will take place during the preparation of the business plan. They should be concluded after approval of the business plan in connection with negotiation of a development agreement. *Should the Government and the developer fail to negotiate a fee or development agreement, the Government at its option may direct that the developer cease all work on the project and may negotiate with other developers for preparation and/or implementation of the business plan.*

(Emphasis added.) The solicitation further provided that, "*Upon selection, the Government will work with the developer in the preparation of the business plan including the terms of the development agreement. If the Government and the selected developer are unable to reach an agreement, the Government may terminate the negotiations at no cost to the Government* and begin negotiations with others." (Emphasis added.)

Finally, the section of the solicitation titled "Option to Extend the Term of the Contract" provided:

(a) The Government shall have the *unilateral option* of extending the term of this contract beyond the Base Contract for completion of the Option for a period of approximately sixteen (16) years. The same terms and conditions contained in this contract shall apply to the option, if exercised. *The Option shall be exercised upon written notification* (mailed or otherwise furnished) to the Contractor within four (4) years from the date of Notice to Proceed for the Base Contract....

(b) *The exercise of options is a Government prerogative, not a contractual right on the part of the Contractor.* If the Government exercises the option(s) within the prescribed time frames, the Contractor shall be bound to perform the services for the option period(s) or be subject to the default provisions of the contract.

(Emphasis added.)

In addition to the foregoing provisions regarding the two separate phases of the contract, the solicitation laid out the technical requirements for offerors.[3] The solicitation anticipated that offers might come from corporations, nonprofit or charitable institutions, partnerships, limited liability companies, business associations, or joint ventures. In particular, special rules were included for joint ventures, requiring all joint venturers to: include with their joint offer a copy of their executed joint venture agreement; have each joint venturer sign the proposed contract documents prior to award; and, in the case of individual joint venturers that were

---

**3.** The technical requirements were set out in Volume I, section 4, of the solicitation.

also corporate entities, include their corporate secretaries' certification that the corporations were authorized to participate in the joint venture.[4] Each joint venture was also directed to provide a certificate identifying a single point of contact for the government to use in evaluating the offer and administering the contract.

## 2. The offer and award

On June 16, 1997, LaSalle submitted an offer for the contract. LaSalle included a signed SF–33,[5] its technical proposal, and one attachment: a copy of a June 13, 1997 letter from Herman Bulls of LaSalle to Moore memorializing the parties' response to the solicitation. The SF–33 identified only "Herman A. Bulls, Principal, LaSalle Partners" as the offeror. The technical proposal, however, stated that, "LaSalle Partners Limited and Moore & Associates, Inc. ("the Offeror") are pleased to present this proposal for partnership," and there are references throughout the proposal to both LaSalle and Moore. In particular, the proposal stated that, "LaSalle Partners will work with Moore & Associates, in servicing GSA/FDA. Resources will be drawn from the Project Team's wide range of specialties to deliver the services required by the contract." The technical proposal also directed the government to refer to the June 13, 1997 letter, which it called a "Partnering Agreement" between LaSalle and Moore. That letter provided as follows:

> LaSalle . . . & Moore . . . have agreed to submit a joint response to the Solicitation on the following terms and conditions. . . . Each party shall bear all costs, risks and liabilities incurred by such party arising out of its obligations and performance under this agreement. LaSalle shall be the

lead firm for production and submission of the response and shall be responsible for integrating the information provided by Moore. Moore shall submit all relevant information required by LaSalle for submission of the response and shall actively participate and review the response prior to its submission to GSA. In the event that the submission by LaSalle and Moore is accepted, the parties shall enter into an agreement to jointly provide the services to GSA, including the business plan required by the Solicitation. . . . For purposes of submission of the response, Herman E. Bulls on behalf of LaSalle and Lloyd W. Moore on behalf of Moore shall be the parties' primary points of contact.

The letter is signed by the principals of each company, Mr. Bulls and Mr. Moore. The letter was not notarized nor did it carry a corporate seal from either party.

After the best and final offer signed by LaSalle was submitted on July 21, 1997,[6] the contract was awarded to LaSalle on July 30, 1997. The contract provided for the development of a business plan, for which the SF–33 specified a fixed price of $200,000.[7] In the letter sent to LaSalle transmitting the award, GSA's contracting officer Elizabeth Vitale wrote:

> I am pleased to inform you that your offer . . . has been accepted as follows:
> - Initial Planning Phase: $200,000
> - Project Implementation
> Option: To be negotiated during Initial Planning Phase
>
> A signed copy of Contract GS11P97MMC0020 is enclosed. Notice is hereby given to proceed with the Initial Planning Phase of the contract.

It is undisputed that after the contract was awarded, the government consistently recog-

---

4. At the time of the contract award, Moore was a corporation.

5. The SF–33 is the government's standard form, "Solicitation, Offer and Award." Once LaSalle was chosen for the award, the SF–33 was signed by the GSA contracting officer, Elizabeth Vitale, accepting LaSalle's bid and finalizing the contract award.

6. Again, the letter transmitting this offer was signed only by Herman E. Bulls, Principal, LaSalle Partners Limited, despite the fact that the first line of the letter states, "LaSalle . . . and

Moore . . . are pleased to respond to the . . . request for a best and final offer."

7. On November 6, 1997, GSA issued an amendment to the contract in the amount of $425,000. This amendment was issued to allow plaintiffs to commission studies to support its business plan development for the White Oak site. The studies were to focus on architecture, land planning, preconstruction services, "macro office and lab programming," traffic planning and lease planning.

nized the participation of both LaSalle and Moore in the business plan development work. GSA's press release announced the "selection of LaSalle Partners Limited of Chicago, Illinois, and Moore & Associates Inc., Silver Spring, Maryland, to prepare a development plan for the former Naval Surface Warfare Center (NSWC) at White Oak, Maryland." And in an article co-written by Jag Bhargava, the GSA contracting officer's representative, and Nelson Alcalde, the source selection official, the authors stated that GSA had selected "the joint venture of LaSalle Partners and Moore & Associates as the government's development partner for the former Naval Surface Warfare Center at White Oak."

### 3. The business plan

Work commenced on the business plan on August 4, 1997, and until sometime in 1998, both LaSalle and Moore collaborated with the government to produce the business plan contemplated by the solicitation for the development of the White Oak project. It is undisputed that the government dealt with both LaSalle and Moore on a consistent basis in meetings and written communications, and recognized that both parties were playing a role in the contract work.

According to plaintiffs, LaSalle and Moore met with government representatives in December 1997 to begin negotiations on a development agreement as required by the contract; the parties agree that they never reached agreement on this development deal. Plaintiffs contend that starting in March 1998 the government began a pattern of conduct aimed at undermining the approach to development contemplated in the solicitation and in LaSalle and Moore's proposed business plan. Specifically, plaintiffs charge that because the government concluded late in the process that plaintiffs' initially-proposed business plan was inconsistent with certain Office of Management and Budget ("OMB") requirements known as "scoring rules," the government abandoned its relationship with plaintiffs and thereby breached its contract with plaintiffs.

Eventually, at a meeting held on January 28, 1999, GSA notified LaSalle and Moore

that it did not intend to use the business plan LaSalle and Moore submitted and that it intended to develop the project on its own. The contract relationship between LaSalle and Moore and the government therefore came to an end.

### B. Procedural Posture

#### 1. LaSalle and Moore's claim

Upon learning that they would no longer be working on the project, on March 15, 1999, the plaintiffs submitted a claim to GSA seeking: 1) $2,375,711 for excess direct costs and expenses associated with the business plan Phase I of the contract; 2) $14,310,310 for damages resulting from their exclusion from the White Oak project; and 3) $43,004,909 in lost profits. Plaintiffs contended in their claim that these damages were a result of the government's breach of their contract and dissolution of their "public-private partnership." Plaintiffs charged that the government violated the contract by requiring the plan to be rewritten to comport with OMB's scoring rules, arguing that the revisions requested by the government led to substantially higher business plan development costs. In their claim letter, plaintiffs also argued that they were entitled to damages arising from the government's refusal to negotiate a fee development agreement with them. Plaintiffs charged: "Notwithstanding whether GSA determined to utilize LaSalle–Moore's business plan for the White Oak site, or not, LaSalle–Moore was awarded the Project Implementation Option and, thus, was entitled to earn a fee for the development of the FDA headquarters." Finally, plaintiffs claimed lost profits based on the government's "unilateral and unjustified dissolution of the public-private partnership." Plaintiffs contended that the "dissolution" amounted to a "bad faith" termination of the contract.

On June 16, 1999, the contracting officer denied the claim. In her letter, with respect to the claim for excess Phase I costs, Ms. Vitale stated:

the Government was obligated to pay the contractor $200,000 upon successful completion of the business plan to the reasonable satisfaction of the Contracting Offi-

cer.... [I]t is the Government's position that all of the work performed by LaSalle during the Initial Planning Phase was within the scope of the contract. Therefore, your claim in the amount of $2,375,711.00 for excess direct costs and expenses arising from GSA's alleged mishandling of the Initial Planning Phase of the contract is denied.

With respect to the remaining damage and lost profits claims, she stated: "The remainder of your claim is for damages and anticipatory profit for an option period that was never exercised.... Therefore, your claim in the amount of $14,310,310.00 for damages resulting from exclusion from the FDA project, and $43,004,909.00 for lost profits that could have been earned is denied."

### 2. This litigation

Plaintiffs filed the present action on September 13, 1999, seeking the same damages they sought before the contracting officer. After the joint preliminary status conference on April 10, 2000, it became apparent to the court that the resolution of certain "threshold issues" would expedite the ultimate resolution of this litigation. In particular, it was agreed that early on the parties should address two issues: 1) whether the government exercised its option to retain LaSalle and Moore to perform the Implementation Phase of the contract; and 2) whether the government entered into a legally-binding partnership agreement with LaSalle and Moore to develop the White Oak site regardless of whether the government elected to pursue plaintiffs' business plan. Following discovery on these issues, the government filed a motion for summary judgment on both issues and for the dismissal of plaintiff Moore. In opposition, LaSalle and Moore have filed a response in which they argue that there are genuine factual disputes that preclude an award of summary judgment in favor of the government or dismissal of Moore. Oral argument was held on February 12, 2001.

### DISCUSSION

### A. Standard of Review

This case turns on questions of contract interpretation that are properly before this court on motion for summary judgment. *Olympus Corp. v. United States,* 98 F.3d 1314, 1316 (Fed.Cir.1996); *Uniq Computer Corp. v. United States,* 20 Cl.Ct. 222, 223 (1990). Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See* Rule 56(c) of the Rules of the Court of Federal Claims ("RCFC"). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Liberty Lobby,* 477 U.S. at 247–48, 106 S.Ct. 2505. In deciding whether summary judgment is appropriate, it is not the court's function "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. 2505.

### B. Moore Is Not in Privity with the Government and Thus Does Not Have Standing

The government argues that Moore does not have standing to maintain this action because Moore was never in privity with the government. The government contends that in such circumstances, Moore's claims must be dismissed.

### 1. There was no joint venture between LaSalle and Moore

LaSalle and Moore argue that they formed a joint venture as offerors for the White Oak project contract and that Moore has standing as a joint venturer. If Moore is a joint venturer, it would have standing as a member of the joint venture. *See Ward–Schmid Co., Inc. v. United States,* 18 Cl.Ct. 572, 575 (1989). However, if Moore was simply LaSalle's subcontractor, it would not have standing. *See Severin v. United States,* 99 Ct.Cl. 435, 443, 1943 WL 4198 (1943).

Joint ventures are recognized legal entities for contracting with the government under the Federal Acquisition Regulations

("F.A.R."). The F.A.R. identifies two types of team arrangements: joint ventures and prime contractor-subcontractor relationships. Section 9.601 of the F.A.R. provides this definition:

"Contractor team arrangement" means an arrangement in which—

(a) Two or more companies form a partnership or joint venture to act as a potential prime contractor; or

(b) A potential prime contractor agrees with one or more other companies to have them act as its subcontractors under a specified Government contract or acquisition program.

And section 9.603 of the F.A.R. provides: The Government will recognize the integrity and validity of contractor team arrangements; *provided,* the arrangements are identified and company relationships are fully disclosed in an offer . . . .

In the instant case, even though plaintiffs assert that they formed a joint venture to perform this contract, they have not produced any evidence to support the existence of such a joint venture.[8] First, plaintiffs concede they did not form a separate business entity for the joint venture. Second, plaintiffs concede they did not adhere to the terms of the solicitation for joint venturers. Under the solicitation, GSA expressly required the following information from joint venture teams:

A joint venture (team arrangements) shall meet the following requirements:

(1) All offers submitted by joint ventures must include a copy of the executed joint venture agreement.

(2) All parties to the joint venture must sign the proposed contract documents prior to award (the requirement to sign the proposal notwithstanding). In the case of corporations that are venture entities, the corporation secretary must certify that the corporation is autho-

rized to participate in the joint venture, by so certifying in the joint venture agreement and by submitting a separate certification to the Government prior to contract award. The joint venture must also provide a certificate which identifies a single point of contact, i.e., a principal representative (by name) of the joint venture for purposes of resolution of contractual matters and payment issues.

Plaintiffs acknowledge that they did not submit the necessary corporate certification from Moore's secretary, and they also acknowledge that Moore did not sign the contract. They nonetheless argue that the government "understood" that LaSalle and Moore had become joint venturers and that it would be contracting with both parties.

In support of their contention that LaSalle and Moore formed a joint venture, plaintiffs rely on a June 13, 1997 letter from Herman Bulls of LaSalle to Moore which was submitted to the government with the solicitation. The letter includes the following statements: "LaSalle Partners Limited . . . and Moore & Associates, Inc. . . . have agreed to submit a joint response to the Solicitation on the following terms and conditions"; "LaSalle shall be the lead firm for production and submission of the response and shall be responsible for integrating the information provided by Moore."; and "In the event the submission by LaSalle and Moore is accepted, the parties shall enter into an agreement to jointly provide the services to the GSA, including the business plan required by the Solicitation."

The court concludes that this letter is not by its terms "an executed joint venture agreement" as required by the solicitation, and does not prove the existence of a joint venture. At best, the letter expresses the plaintiffs' intention to form a joint venture in the future, upon the award of the contract.[9]

---

**8.** At oral argument, the court gave plaintiff Moore twenty days to file any evidence it may have had to show that Moore's alleged participation in a joint venture with LaSalle was ratified. On February 28, 2001, plaintiffs reported to the court that there is no additional evidence of the alleged joint venture between the two

parties beyond that already submitted by plaintiffs.

**9.** A second letter sent to Moore by LaSalle on June 16, 1997, bolsters this conclusion. The second letter contained the following: "LaSalle shall have the right to make all final decisions

The court acknowledges that had plaintiffs presented evidence to show that they in fact established a joint venture, the court would have likely concluded that Moore had standing in this matter. The Federal Circuit has determined that where a joint venture in fact exists, strict adherence to the formalities of the solicitation may not be necessary. *See generally Sadelmi Joint Venture v. Dalton,* 5 F.3d 510 (Fed.Cir.1993). But here, even after the court provided plaintiffs with additional time to produce evidence of the alleged joint venture, plaintiffs failed to provide the court with any evidence to show that the parties in fact entered into a joint venture arrangement. Absent proof of such an agreement or ratification by Moore of its forming a joint venture with LaSalle, the court finds that Moore was LaSalle's subcontractor. Accordingly, while the government may have recognized the existence of a La-Salle–Moore "team," it contracted directly with, and thus established privity with, La-Salle alone. Moore was not in privity with the government, therefore Moore does not have standing.[10]

### 2. There is no implied contract giving Moore standing

 Plaintiffs' contention that there was an implied contract between Moore and the government must also fail. This court cannot find that there was an implied contract between Moore and the government because no implied contract can exist where there is

an express contract "dealing with the same subject." *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1326 (Fed.Cir.1997); *Atlas Corp. v. United States,* 895 F.2d 745, 754–55 (Fed.Cir.1990) (citing *ITT Fed. Support Servs. v. United States,* 209 Ct.Cl. 157, 531 F.2d 522, 528 n. 12 (1976)); *Starflight Boats v. United States,* 48 Fed.Cl. 592, 599–600 (Fed.Cl.2001) (and cases cited therein). The plain language of the contract expressly establishes LaSalle as the only contract awardee in this case, a fact not altered by the government's willingness to publicly recognize Moore's contributions to the project as a team member.

For all of these reasons, taking every allegation by plaintiffs to be true, plaintiffs have not alleged facts or presented sufficient evidence to show that Moore was in privity with the government. Moore does not have standing to sue on the contract.[11] The government's motion for dismissal of plaintiff Moore is therefore **GRANTED**.

The court will now consider the remaining two threshold issues: whether the government exercised the option to move into Phase II of the contract with LaSalle and whether the government entered into a partnership with LaSalle.

### C. The Government Did Not Exercise the Contract Option

At the heart of this dispute is LaSalle's contention that it is entitled to damages in-

---

with respect to the submission to the GSA and the provision of services to the GSA," and "If for any reason the parties cannot reach concurrence on the terms of agreement ... either party may terminate without liability or obligation to the other." The letter also established that the $200,000 fixed fee for the business plan was to be split, with LaSalle receiving $193,000 and Moore receiving $7,000. This letter further demonstrates that neither of the hallmark indicia of a joint venture existed between LaSalle and Moore: a community of interest and a right to joint control. 46 AM. JUR.2d *Joint Ventures* § 9 (1994 & Supp.2000). *See also Resolution Trust Corp. v. BVS Dev., Inc.,* 42 F.3d 1206, 1214 (9th Cir.1994); *Circo v. Spanish Gardens Food Mfg. Co., Inc.,* 643 F.Supp. 51, 54 (W.D.Mo.1985).

10. Plaintiffs make much of certain government representatives' references to both LaSalle and Moore to suggest that the government is es-

topped or has waived its right to challenge Moore's standing. This argument is without merit. First, "the mere characterization of the relationship by a lay person does not create the legal relationship. The elements of a joint venture must be met." *Inhabitants of City of Saco v. General Electric Co.,* 779 F.Supp. 186, 192 (D.Me.1991). Second, for the reasons discussed in Part E, *infra,* the fact that GSA representatives other than the contracting officer recognized that Moore had a role in the project does not give rise to a claim for equitable estoppel against the government because those representatives did not have authority to bind the government to a contract with Moore.

11. It is important to note that the court's decision that Moore has no standing does not eliminate any claims against the government. LaSalle is free to pursue the remaining claims on behalf of itself and its subcontractor, Moore.

cluding lost development fees and profits arising from the government's decision to federally fund the White Oak project and proceed without LaSalle as its "private partner." To support this damage claim, LaSalle contends that it: 1) had a contract for development of the White Oak site; and 2) had "partnered" with the government for development of the site. The court will discuss each of these claims in turn.

### 1. Option contracts

■■■ There is no dispute that the subject contract was by its terms an option contract. Option contracts are a particular type of government contract that carry their own special rules. A standard option provision in a government contract puts an obligation on the contractor to perform the additional contract work if the government exercises the option, "but it does not create a legal obligation on the part of the government to exercise the option and require the work." *Continental Collection & Disposal, Inc. v. United States*, 29 Fed.Cl. 644, 650 (1993) (citing *Government Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 813 (Fed.Cir. 1988)). Under standard option clause language, "the Government, at its discretion, ha[s] a broad, unilateral right either to exercise the option periods or not to exercise them." *Aspen Helicopters, Inc. v. Department of Commerce*, GSBCA No. 13258–COM, Sept. 30, 1999, 99–2 BCA ¶ 30,581, at 151,024, 1999 WL 795489. Finally, "[f]or an option order to be effective, the Government must exercise the option in exact accord with the terms of the contract." *Freightliner Corp. v. Caldera*, 225 F.3d 1361, 1366 (Fed.Cir.2000).

■■ Importantly, "[t]he government's failure to exercise an option in a contract does not ordinarily give rise to a breach of contract action." *United Mgmt. Inc. v. Department of the Treasury*, GSBCA No. 13452–TD, Apr. 11, 1996, 96–2 BCA ¶ 28,312, at 141,362, 1996 WL 182798. "The United States Court of Federal Claims and the boards of contract appeals have consistently recognized that option contracts generally bind only the option giver, and not the option

holder." *Aspen Helicopters*, GSBCA No. 13258–COM, ¶ 30,581 at 151,024.

### 2. The development option was never exercised

The court has carefully examined all of the documents that comprise the contract between the government and LaSalle, and in particular, the May 1997 solicitation and the July 1997 SF–33 and award letter from GSA to LaSalle. There is nothing in any of the documents that could lead a reasonable person to believe that the government exercised its option for development of the White Oak project. Set forth below are the provisions from the solicitation governing the option for the White Oak project: [12]

> The government will have the option to negotiate with the developer a development agreement for the purpose of implementing the business plan. It is anticipated that the agreement will be that of a fee developer. *The government reserves the right to negotiate with others to implement the business plan.*

> Scope of Work, Project Implementation Option. *The government, at its sole discretion, may exercise the option to proceed with the project in accordance with the business plan.* The option may be exercised at any time for a period of three years after acceptance of the business plan....

> Fixed Price. The government will pay the Developer a firm fixed price of $200,000 upon completion of the business plan to the reasonable satisfaction of the Contracting Officer....

> Project Implementation Fee. Any fee for the project implementation phase will be negotiated between the government and the developer.

> Basis of Award.... [A] total price will be determined by adding the $200,000 for the business plan to the offeror's anticipated fee for the option.

> Fee Expectations. The developer should discuss its fee expectations for the option phase (i.e. proceeding with the project (at the government's option) in accordance

---

12. All quotes are from the May 14, 1997 Final Solicitation (emphasis added).

with the business plan).... *Should the Government and the developer fail to negotiate a fee or development agreement, the Government at its option may direct that the developer cease all work on the project and may negotiate with other developers for preparation and/or implementation of the business plan.*

Upon selection, the Government will work with the developer in the preparation of the business plan including the terms of the development agreement. *If the Government and the selected developer are unable to reach an agreement, the Government may terminate the negotiations at no cost to the Government and begin negotiations with others.*

*Option to Extend the Term of the Contract. The Government shall have the unilateral option of extending the term of this contract beyond the Base Contract for completion of the Option for a period of approximately sixteen (16) years....* The *Option shall be exercised upon written notification (mailed or otherwise furnished) to the Contractor within four (4) years from the date of Notice to Proceed for the Base Contract.... The exercise of options is a Government prerogative, not a contractual right on the part of the Contractor.*

It is plain from the terms of the solicitation that the parties contemplated that the option to develop the White Oak site was only to be exercised after the development plan was approved, a development agreement had been negotiated, and the government had elected to proceed with development by exercising the option "in writing." In addition, it is also plain from the solicitation that the parties placed no condition or limitation on the government's discretion to exercise or not exercise the option.

Given the terms of the solicitation, La-Salle's contention that the option was exercised upon award is unfounded. The is nothing in the letter to Mr. Bulls of LaSalle from the GSA contracting officer that would suggest the option had been exercised upon award of Phase I of the contract. By its terms, the letter states that the option must still be negotiated:

I am pleased to inform you that your offer . . . has been accepted as follows:

- Initial Planning Phase: $200,000
- Project Implementation
 Option: *To be negotiated during Initial Planning Phase*

A signed copy of Contract GS11P97MMC0020 is enclosed. Notice is hereby given to proceed with the Initial Planning Phase of the contract.

(Emphasis added.) Moreover, the SF–33 dated July 30, 1997, and signed by both the GSA contracting officer and Mr. Bulls of LaSalle, provides for payment of only $200,000, the price specified for the fixed-price business plan only.[13]

Indeed, none of the conditions precedent for exercising the option were ever satisfied. It is not disputed that the parties failed to negotiate a development agreement. In addition, it is not disputed that the government never provided plaintiffs with written notification of any decision to exercise the development option. Finally, there is nothing in the award letter or elsewhere in the record to suggest that these conditions were waived by the contracting officer. Without this evidence, there is simply no basis upon which to conclude that the government exercised its option to have LaSalle develop the White Oak site.

It is beyond question that absent evidence of a contract, the government is not liable for damages associated with any alleged breach of that contract. In order to recover for breach of contract, plaintiff must prove the existence of "a valid contract between the

---

**13.** F.A.R. 15.204 provides that all of the above-cited provisions are part of the contract as a whole, and as such, each provision governs the relationship between the parties. The F.A.R. dictates a "uniform contract format" to facilitate preparation of solicitations and contracts, and to make it easier for offerors, contractors, and contract administrators to apply the terms of a contract. Accordingly, the following items all become part of a contract: 1) the schedule (including the solicitation and contract forms, supplies or services and price/costs statement of work, specifications, special requirements); 2) the contract clauses; and 3) the list of documents, exhibits and other attachments. F.A.R. 15.204–1; J. Cibinic & R. Nash, *Formation of Government Contracts* 756–67 (3d ed.1998).

parties." *San Carlos Irrigation and Drainage Dist. v. United States,* 877 F.2d 957, 959 (Fed.Cir.1989); *Pennsylvania Dept. of Transp. v. United States,* 226 Ct.Cl. 444, 643 F.2d 758, 762 (1981) (holding it is a "well-established rule ... that a government contractor bears the burden of establishing the fundamental facts of liability, causation and resultant injury") (citations omitted). Here, the parties never executed a contract between the government and LaSalle for development of the White Oak site. In such circumstances, LaSalle's claim for damages based on the breach of the development option contract must fail as a matter of law.

LaSalle's reliance on statements made by several individuals associated with the project to support its contention that the government had "impliedly" exercised the option to develop the White Oak site with LaSalle must also fail. The basic facts upon which L LaSalle relies to establish that the option was impliedly exercised by the government may be summarized as follows:

1) In their depositions, Mr. Bulls and Mr. Moore asserted that they were told that the implementation option had been exercised by various people: Jag Bhargava, the GSA contracting officer's representative; Nelson Alcalde, the administrator of GSA's National Capital Region and the source selection official; and Patrick Keogh, one of GSA's consultants on the White Oak project.

2) Mr. Bulls asserted that other statements lead LaSalle to believe the option had been exercised: "Everything from our introduction in consistently periodic meetings with the community, direct statements from the executive director of the project on behalf of the GSA, as well as their consultant, Mr. Bhargava and Mr. Keogh, meetings I had with my chairman, chairman of LaSalle Partners at the time ... the comment that, 'Whatever happens here, whether it is funded by the government or through the business plan, you will implement it,' and all those were inducements that convinced me that we should continue to place our best people and our prime resources towards this effort."

3) GSA "knew" it had created an expectation in plaintiffs that the option was exercised.

4) The FDA contract was explicitly "modeled" on an earlier GSA contract that had been used for the development of a campus for the National Institutes of Health ("NIH"), and according to plaintiffs, the NIH example was used by GSA "to explain how the instant contract was to work." Under the NIH contract, the Phase I business plan developer, Boston Properties, was retained to participate in Phase II despite the fact that the government declined to implement its business plan. LaSalle therefore reasonably expected to be treated the same under the FDA contract as Boston Properties was treated under the NIH contract: as the Phase II developer.

Even viewing all of these facts most favorably for the plaintiff, LaSalle has failed to establish any triable issue regarding an implied exercise of the government's option for development of the White Oak site. First, as discussed above, where as here there is an express contract, no implied contract can arise "dealing with the same subject." *Atlas Corp.,* 895 F.2d at 754–55; *Starflight Boats,* 48 Fed.Cl. at 597–98. Because GSA could only have exercised the option "in writing" after approving the business plan and successfully negotiating a development agreement—which plainly the government did not—LaSalle's contention that the option was exercised via an implied contract fails as a matter of law.

 Second, even if each of the above-noted "facts" are taken as true, they do not establish that the government exercised the option to have LaSalle develop the White Oak project. None of the statements relied upon by LaSalle were made by the person with the requisite authority to bind the government: the GSA contracting officer, Ms. Vitale. LaSalle cannot rely on the statements of other government representatives to establish that LaSalle and the government had in fact agreed that LaSalle would participate in the development of the White Oak site under Phase II of the contract. "What-

ever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir. 1990); *H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed.Cir.1989) (holding that plaintiff "must show that the officer whose conduct is relied upon had actual authority to bind the government in contract" in order to recover for breach of an express or implied-in-fact contract with the United States). "Absent actual authority on the part of the Government's agent to bind the Government in contract, no binding contract can exist, regardless of the agent's representations." *John Doe v. United States,* 100 F.3d 1576, 1584 (Fed.Cir.1996).

Here, there is no evidence that the contracting officer ever made any statements to the plaintiffs that would support plaintiffs' view. Plaintiffs have acknowledged that Ms. Vitale never told them that the government had exercised the option: both Mr. Bulls and Mr. Moore were asked in deposition if there were any communications from Ms. Vitale regarding exercise of the implementation option, and both men answered, "I can't recall." Plaintiffs failed to produce any other evidence to put into question whether Ms. Vitale exercised the option. Without any evidence of a statement by the person authorized to bind the government, LaSalle does not put any facts into dispute regarding the alleged exercise of the development option; its argument that summary judgment is premature therefore fails.

■ In sum, the undisputed evidence establishes that the government never expressly or impliedly exercised the option to have LaSalle develop the White Oak site. Thus, the government is not liable to LaSalle for lost development fees, lost profits or any other damages arising from an alleged breach of contract for the development of the White Oak site.[14]

## D. There Was No Partnership Agreement Between LaSalle and the Government That Guaranteed LaSalle the Right to Be the White Oak Project Developer

LaSalle also supports its claim for lost development fees and profits on the theory that in forming a "public-private partnership" with the government, LaSalle was guaranteed the right to develop the White Oak site regardless of whether LaSalle's business plan for the development was adopted. LaSalle alleges that the government breached its partnership obligations when it decided to proceed without LaSalle using only government funds.

LaSalle asserts that the words of the contract itself constitute an express partnership agreement. LaSalle states correctly that a "public-private partnership" was formed between LaSalle and the government. However, LaSalle's contention that a "public-private partnership" is the legal equivalent of a commercial "partnership" is not supported. LaSalle contends that the nature of its relationship with the government is spelled out in the Government Accounting Office ("GAO") publication titled, "Public–Private Partnerships: Terms Related to Building and Facility Partnerships." LaSalle claims that this pamphlet defines "public-private partnerships" as synonymous with commercial partnerships. The term "partnership" appears in the glossary of the GAO pamphlet accompanied by the following definition: "A partnership is a legal relationship existing between two entities contractually associated as joint principles in a business." LaSalle argues that the inclusion of this definition in the GAO publication is conclusive proof that the

14. The government argues in the alternative that even if the court were to hold that the option had been exercised, that exercise would have been unlawful and thus void under the Competition in Contracting Act, 41 U.S.C.A. §§ 251–260 (1987 & Supp.2000). The gist of the government's argument is that because LaSalle's best and final offer provided only a range of fees and not a specific dollar amount for its bid on the implementation option, Ms. Vitale was prohibited from awarding the Phase II contract work to LaSalle absent a "written justification for doing so upon a noncompetitive basis." Because the court concludes that option was never exercised, it is not necessary to reach this issue.

government sees "public-private partnerships" as legally-binding relationships.

The government acknowledges that the GAO pamphlet includes a definition of general commercial partnerships, but asserts that the pamphlet by its terms does not suggest that a "partnership" was created here. The court agrees. Besides defining commercial partnerships, the GAO pamphlet also includes a separate definition for the term "public-private partnership," and the definition for a "public-private partnership" is quite different from that of a general commercial partnership:

> Under a public-private partnership, sometimes referred to as a public-private venture, *a contractual arrangement is formed between public- and private-sector partners.* These arrangements typically involve a government agency contracting with a private partner to renovate, construct, operate, maintain, and/or manage a facility or system, in whole or in part, that provides a public service.

> Under these arrangements, the agency may retain ownership of the public facility or system, but the private party generally invests its own capital to design and develop the properties. Typically, each partner shares in income resulting from the partnership. Such a venture, *although a contractual arrangement,* differs from typical service contracting in that the private-sector partner usually makes a substantial cash, at-risk, equity investment in the project, and the public sector gains access to new revenue or service delivery capacity without having to pay the private-sector partner.

*Public–Private Partnerships: Terms Related to Building and Facility Partnerships,* GAO/GDD–99–71, April 1999 (emphasis added).[15]

15. This meaning of the phrase "public-private partnership" was understood and applied by GSA, as described in the deposition testimony of Mr. Alcalde: a public-private partnership is a way of articulating "a philosophy, [it's] not specifically defining what a partnership is." The court agrees with Mr. Alcalde's understanding. It is clear from the context of the present agreement that the use of term "public-private part-

■ Thus, a "public-private partnership" is quite different from a commercial partnership. A legally-binding commercial partnership is defined as "an association of two or more persons to carry on as co-owners [of] a business for profit." Revised Uniform Partnership Act (1994) (U.L.A.) § 101.[16] "[T]he attribute of co-ownership distinguishes a partnership from a mere agency relationship." *Id.* § 202 (in Comment). "A partnership is established through the voluntary agreement of the parties." *In re Ashline,* 37 B.R. 136, 140 (Bankr.N.D.N.Y.1984). *See also* 59A AM. JUR.2d *Partnership* § 148 (1987 & Supp.2000). The essential characteristics which generally are used to support the conclusion that a partnership exists are: 1) the intentions of the parties; 2) co-ownership of the business property; and 3) sharing of the profits and generally the losses as well; and 4) evidence that each alleged partner participated in the management of the business or had some right to control the function or conduct of the business. *Coca–Cola Bottling Co. of Elizabethtown, Inc. v. Coca–Cola Co.,* 696 F.Supp. 57, 74 (D.Del. 1988) ("The necessary indicia of a legal partnership ... include one party having a voice in the management of the other's manner of conducting business, sharing of risks, and joint control or ownership of assets."); *H.C. Nelson v. Seaboard Surety Co.,* 269 F.2d 882, 887 (8th Cir.1959) (holding that whether a partnership exists depends on whether parties exhibited an objective intent to satisfy the requirements of partnership). *See generally* 59 AM. JUR. §§ 148–175.

■ Tested against these general commercial partnership standards, there can be no doubt that the agreement between LaSalle and the government never rose to the level of a legally-binding commercial partnership in which each side owes a fiduciary

nership" describes a manner of doing business and carries no legal import.

16. All states but one have adopted the Uniform Partnership Act, making its definitions widely-accepted. Pertinent to this litigation, both Maryland and the District of Columbia have adopted the Revised Uniform Partnership Act. *See* 6 U.L.A. 1 (Supp.2000).

responsibility to the other.[17] *See id.* § 421. The contract awarded to LaSalle, by its terms, did not contain any of the defining aspects required to create a commercial partnership. The contract did not make LaSalle a co-owner of the White Oak site or any other government assets, nor did the contract provide for any sharing of profits or losses.[18] Indeed, the fee for preparing a satisfactory business plan was fixed at $200,000, and the contract plainly identified the work as "work for hire" and "property of the government." [19] Further, plaintiffs were not given any control over the project.

In these circumstances, the court finds that there was unambiguously a fixed-price contract for preparation of a business plan with an option for development. The court will not read into the contract "partnership" terms that were not included; the plain language governs. *See International Transducer Corp. v. United States,* 30 Fed.Cl. 522, 530 (1994), *aff'd,* 48 F.3d 1235 (Fed.Cir.1995).

In view of the foregoing, LaSalle's contention that a broader partnership agreement can be implied from the totality of the circumstances surrounding the administration of the subject contract also fails. LaSalle cites numerous facts and statements from the record in support of its allegation that a partnership for the development of the White Oak site was formed between it and the government:

1) LaSalle contributed its skill and expertise "in designing and managing a development of [the] size, duration and magnitude" of the FDA project, and the government entered the partnership with the express goal of acquiring those benefits.

2) LaSalle "contributed large amounts of capital represented by direct cash outlays and the performance of services necessary to the partnership by their own personnel."

3) There was potential for both loss and revenue sharing if the project had gone forward without full federal funding.

4) This contract was expressly modeled on an earlier GSA "public-private partnership" contract for the development of a federal facility for NIH. Under that contract, the private developer was retained as the development partner for the Implementation Phase of the development despite the rejection of its business plan, and as such, the government intended to treat LaSalle just the same, as a partner.

5) The "collective result of facts in the record demonstrate the parties themselves intended to be partners" given the "repeated characterization of their relationship by the repeated references to 'partners' and 'partnership.' "

 a) The solicitation itself was for "A Public–Private Partnership Opportunity."

 b) According to the advertisements for the project as well as the representations of GSA personnel (excluding the contracting officer herself), the White Oak project would proceed under a "different kind of procurement" than a normal federal facilities procurement.

 c) Mr. Keogh, the consultant on the project, explained his vision of "public-private partnership" to LaSalle on numerous occasions, and Mr. Keogh represented that the government and

---

17. In its complaint, LaSalle claims that the government "owed plaintiffs fiduciary duties as its partner, including a duty of good faith and fair dealing."

18. To bolster their claim that a partnership was formed between plaintiffs and the government, plaintiffs emphasize the magnitude of risk they allegedly assumed by teaming with the government. Because the option to develop the White Oak site was never exercised, these risks never materialized and plaintiffs were only liable to produce a business plan for a fixed fee of $200,000.

19. Plaintiffs argue that the existence of a "partnership" for the development is demonstrated by the fact that plaintiffs spent more than $200,000 and did more than prepare the business plan. These facts do not establish recognition of a partnership for development of the White Oak site. It is well-established that a contractor who performs work beyond the scope of a fixed price contract assumes the risk in making excess expenditures. *Northrop Grumman Corp. v. United States,* 47 Fed.Cl. 20, 56–57 (2000) (citing *ITT Arctic Servs., Inc. v. United States,* 207 Ct.Cl. 743, 763, 524 F.2d 680 (1975)).

LaSalle were "partners." Further, "No one at GSA or FDA advised LaSalle . . . not to heed any advice provided by Mr. Keogh, nor did [they say] that they disagreed with Mr. Keogh's expressions or explanations of the public-private partnership."

d) The Final Source Selection Evaluation Report concluded that, "because this is to be a public-private partnership it is in the nature of a partnership that the partners jointly define the business of the partnership."

First, as discussed above, because the parties entered into an express written agreement there cannot be a separate implied-in-fact agreement. *Atlas Corp.*, 895 F.2d at 754–55; *Starflight Boats*, 48 Fed.Cl. at 599–600. Second, even taking all of the above-cited facts as true, there is nothing to suggest that without exercising the option the government committed to *develop* the White Oak site with LaSalle as its "partner." As noted above, the White Oak project contract was an option contract that gave the government complete discretion to proceed or not proceed with development of the project with plaintiffs' assistance.

In this connection, LaSalle's reliance on GSA's prior conduct regarding a completely different contract is misplaced. Throughout this proceeding, LaSalle has referred the court to the contract involving the development of the NIH campus as a precedent for interpreting the present contract. LaSalle contends that the subject contract was modeled after the "public-private partnership" agreement to develop the campus for NIH, and that even after the government elected to fully fund that project itself, it retained Boston Properties as its "private partner" for various development services. LaSalle contends that the same relationship was established under the present "partnership" agreement, and that it had a similar right to

be retained to develop the FDA White Oak project no matter what.[20]

The NIH contract has no precedential value in interpreting the government's intent with respect to the White Oak project; the present contract must be judged on its own unambiguous terms. When the provisions of a contract are clear, "the court may not resort to extrinsic evidence to interpret them." *HRE, Inc. v. United States*, 142 F.3d 1274, 1276 (Fed.Cir.1998) (quoting *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed.Cir.1996)). "Outside evidence may not be brought in to create an ambiguity where the language is clear." *Id.* (quoting *City of Tacoma v. United States*, 31 F.3d 1130, 1134 (Fed.Cir.1994)). For example, under the express terms of the instant contract, unless the government negotiated a fee agreement with plaintiffs and exercised its option for development of the project, the contract stated that the government could end its relationship with the plaintiffs "*without cost to the Government.*" This court cannot alter unambiguous provisions such as this through the consideration of extrinsic evidence.

Similarly, LaSalle's reliance on statements by persons without the authority to bind the government is misplaced. LaSalle again points to the remarks of Mr. Keogh regarding the nature of the "public-private partnership" to support its contentions. However, Mr. Keogh did not have authority to alter the terms of the express and unambiguous contract between LaSalle and the government. "Absent actual authority on the part of the Government's agent to bind the Government in contract, no binding contract can exist, regardless of the agent's representations." *John Doe*, 100 F.3d at 1584.

In short, because the contract between the government and LaSalle defined the full extent of the parties' relationship, LaSalle's contention that there are facts in dispute

---

**20.** Apart from plaintiffs' attempts to use the government's conduct in administering the NIH contract as precedent, it is informative to note that Boston Properties, the developer chosen to assist with both the business plan and implementation phases of the NIH contract, had documentation of its continuing role in the project, something LaSalle is lacking. According to Ms. Vitale

in deposition, there were documents exchanged between the government and Boston Properties to negotiate the development fee for the NIH project, culminating in a modification of the base contract to award the Phase II development work to Boston Properties. This starkly distinguishes the NIH contract from the FDA contract at issue here.

regarding its right to participate in the eventual development of the White Oak site as the government's "partner" is legally unsupported. The government and LaSalle were never "partners," therefore the government is not liable for lost development fees, profits, or any other damages based on an alleged violation of a "partnership" agreement.

### E. Plaintiffs' Estoppel Arguments Regarding the Alleged Contract and Partnership Must Fail

 LaSalle alternatively argues that summary judgment is not appropriate because it has alleged facts to establish that the government should be estopped from denying that the government promised LaSalle it could develop the White Oak site. Again, LaSalle relies on the various representations and statements allegedly made by people involved in the White Oak project to support its contention. LaSalle alleges that in reliance on the statements enumerated above, LaSalle and Moore acted to their detriment. This argument fails as well. As already discussed, the only person with the authority to alter the express terms of the contract was the contracting officer, Ms. Vitale. Before one may assert the doctrine of equitable estoppel against the government, the Court of Claims has held that it is necessary for the party to show that "the party against whom an equitable estoppel is set up acquiesced in the transaction in such a manner as to change the relationship of the parties and make its repudiation of the proceedings contrary to equity and good conscience." *Emeco Industries, Inc. v. United States*, 202 Ct. Cl. 1006, 485 F.2d 652, 657 (1973). "[L]ack of authority is an absolute bar to applying principles of estoppel, implied-in-fact contract or express oral contract, regardless of the degree of encouragement or even the acceptance of completed work by the officers and employees involved." *Vec–Tor, Inc.*, ASBCA

No. 25,807, Nov. 5, 1984, 85–1 BCA ¶ 17,755, at 88,677, 1984 WL 13812. Here, LaSalle has not alleged any facts to show that a person with authority made comments to LaSalle promising LaSalle the right to develop the White Oak site. Without this evidence, LaSalle's estoppel claims fail as a matter of law.

### CONCLUSION

For all the reasons discussed above, plaintiffs have failed to demonstrate plaintiff Moore's standing or raise any material facts which would preclude summary judgment for the government. Accordingly, the government's motion to dismiss Moore for lack of standing and for partial summary judgment is **GRANTED**. In granting this motion, the court has determined that plaintiffs' claims for $59 million in lost development fees and profits fail as a matter of law. Remaining before the court are the counts in support of the $2,375,711 claim for additional work performed during Phase I of the contract.[21] The court will contact the parties in order to schedule a joint status conference in April 2001 to discuss resolution of this remaining claim for damages. The parties shall be prepared to discuss a discovery schedule and pretrial procedures.

---

21. At oral argument, plaintiff suggested that it would be entitled to "lost profits" if it could establish that the government breached Phase I of the contract by refusing to negotiate a development agreement in bad faith. While the question of whether the government breached Phase I of the contract remains before this court, under standard contract law principles, any damages related to the alleged breach must be limited to the effects of the breach itself. The government cannot be held liable for the "lost profits" that resulted from its failure to exercise the contract option. *Systems Mgmt. Am. Corp.*, ASBCA Nos. 45,704, 49,607, Mar. 3, 1997, 97–1 BCA ¶ 28,820, at 143,811, 1997 WL 103321. *See generally ATACS Corporation v. Trans World Communications*, 155 F.3d 659, 668–71 (3d Cir.1998).