**Commonwealth of PUERTO RICO, DEPARTMENT OF LABOR AND HUMAN RESOURCES, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 98–828C.**

United States Court of Federal Claims.

March 28, 2001.

Steven D. Cundra, O'Rourke & Cundra, Washington, D.C., attorney of record for the plaintiff, with whom was Limo T. Cherian, O'Rourke & Cundra, Washington, D.C., of counsel.

Kevin W. McArdle, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., and David M. Cohen, Director, Commercial Litigation Branch, attorneys of record for the defendant. Vincent C. Constantino, Assistant Counsel, Litigation Employment and Training Legal Services, Office of the Solicitor, United States Department of Labor, of counsel.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

At issue in this case is the interpretation of a settlement agreement between the Commonwealth of Puerto Rico, Department of Labor and Human Resources (DLHR) and the United States Department of Labor (US-DOL). The agreement resolved plaintiff's claim, brought before an administrative law judge (ALJ), that USDOL had improperly rejected DLHR's application to be the service provider for a Section 402 Migrant and Seasonal Farmworker Job Training Program instituted under the Job Training Partnership Act (JTPA), 29 U.S.C. §§ 1672 *et seq.* (1994 & Supp. IV 1998), *repealed effective July 1, 2000 by* Workforce Investment Act of 1998, Pub.L. No. 105–220, § 199(b)(2), 112 Stat. 1059–60.[1] The JTPA authorized US-DOL to fund and oversee programs designed to assist migrant and seasonal farmworkers. 29 U.S.C. § 1672. Public agencies and private, non-profit organizations designed and furnished the actual programs delivering assistance. *Id.* § 1672(c)(1). Under the JTPA, USDOL selected a grant recipient in each service area or jurisdiction every two program years. *Id.* § 1672(c)(2). A program year ran from July 1 to June 30, so that Program Year 1997 ran from July 1, 1997 through June 30, 1998. USDOL was permitted to waive the competition requirement and extend an existing grant for two additional program years if the grantee had performed satisfactorily. *Id.* DLHR has been the program service provider and a recipient of grant funds for Puerto Rico for more than twenty years.

In early 1997, USDOL decided not to waive the competition requirement for the Puerto Rico Service Area because it determined, and announced in the Solicitation for Grant Applications, that DLHR had performed unsatisfactorily. *See* Job Training Partnership Act: Migrant and Seasonal Farmworker Programs; Application of Waiver Provision, and Solicitation for Grant Application, 62 Fed.Reg. 6272, 6273 (Feb. 11, 1997). Subsequently, USDOL invited private, non-profit organizations and public agencies to submit funding applications to operate the program for the Puerto Rico Service Area in Program Years 1997 and 1998. USDOL allocated $2,867,153.00 for the Puerto Rico training program in Program Year 1997. Only DLHR and Rural Opportunities, Inc. (ROI), a New York corporation, submitted applications to compete for the program.

By June 18, 1997, USDOL had not yet reached a decision regarding the grant award for the upcoming program years. As Program Year 1997 was to begin in seventeen days, James C. DeLuca, the grant officer responsible for administering the program grant, informed DLHR that, to ensure continuous delivery of program services, its contract would be extended for ninety days while USDOL completed the selection process. On July 2, 1997, Mr. DeLuca sent DLHR an executed modification to its Program Year 1996 grant which extended the grant period from July 1, 1997 to September 30, 1997, encompassing the first quarter of Program Year 1997. The modification and an attached Notice of Obligation obligated

---

1. Although the JTPA was repealed by the Workforce Investment Act, the Migrant and Seasonal Job Training Program continues today pursuant to Section 167 of the Workforce Investment Act, Pub.L. No. 105–220, § 167, 112 Stat. 1025–27, *codified at* 29 U.S.C.A. § 2912 (West Supp.2000).

$716,788.00 in Program Year 1997 grant funds to DLHR, representing one quarter of the allocation for that program year.

On September 19, 1997, USDOL selected ROI as the Puerto Rico Service Area grantee for the remainder of Program Year 1997 and for all of Program Year 1998. At that time, $2,150,365.00 remained in the allocation for Program Year 1997. DLHR appealed US-DOL's decision to select ROI to an ALJ on September 25, 1997.

Although ROI had been selected as the Program Year 1997 grantee, it could not receive funds from USDOL until it submitted a Grant Funding Plan. To ensure that there was no gap in the delivery of services while ROI submitted its Grant Funding Plan, US-DOL extended and funded DLHR's grant for an additional three-month period. On September 30, 1997, Mr. DeLuca sent DLHR an executed modification to its Program Year 1996 grant which extended the grant period from October 1, 1997 to December 31, 1997, the second quarter of Program Year 1997. The modification and attached Notice of Obligation obligated to DLHR an additional $716,788.00 in Program Year 1997 grant funds. As of September 30, 1997, USDOL had obligated $1,433,576.00 to DLHR, representing half of the Program Year 1997 allocation for the Puerto Rico Service Area.

On October 30, 1997, USDOL and ROI executed a grant agreement designating ROI as the program grantee for the Puerto Rico Service Area from October 1, 1997 to June 30, 1998. The Notice of Obligation accompanying the grant agreement obligated $1,433,576.00 in Program Year 1997 grant funds to ROI.

While DLHR's appeal to the ALJ was pending, Mr. DeLuca learned of irregularities in the selection process which persuaded him that he could no longer support his decision to select ROI. On December 4, 1997, Mr. DeLuca filed a "Motion to Dismiss or, in the Alternative, Motion for Remand" in DLHR's appeal before the ALJ. In the motion, Mr. DeLuca indicated that he was withdrawing his decision to select ROI and stated that he intended to re-compete the grant on an expedited basis. Although Mr. DeLuca withdrew his decision to select ROI,

he did not withdraw ROI's grant in order to ensure the continuation of program services. Thus, both ROI and DLHR were funded at that time.

On December 8, 1997, DLHR and USDOL agreed to resolve DLHR's administrative appeal before the ALJ. The resulting settlement agreement provided that:

> The Department [USDOL] hereby agrees to unconditionally designate and fund DLHR as the only service provider for the Job Training Partnership Act Section 402 Migrant and Seasonal Farmworker Program grant for the service area of the Commonwealth of Puerto Rico for the balance of the Program Year 1997 as well as Program Year 1998, ending on June 30, 1999.

In return, DLHR agreed to withdraw its administrative appeal. Also on December 8, 1997, ROI sent a letter to USDOL withdrawing its application to be the program grantee. The ALJ issued an order approving the parties' settlement agreement and dismissed the administrative appeal on December 10, 1997. *Puerto Rico v. Herman*, No. 97–JTP–24 (US-DOL Dec. 10, 1997).

On December 22, 1997, Mr. DeLuca sent DLHR an executed "no cost" modification to DLHR's Program Year 1996 grant which extended the grant performance period to June 30, 1998. The letter accompanying the modification, however, stated:

> No funds are available to transfer to you at this time, therefore, we are recognizing your plan of service for Program Year 1997 through June 30, 1998. This no-cost extension will allow uninterrupted services to migrant and seasonal farmworkers in Puerto Rico. The additional funds for DLHR will be made available as quickly as possible. When they do become available a modification to adjust service levels may be required.

On January 9, 1998, Mr. DeLuca sent a letter to DLHR designating it as the program grantee for the Puerto Rico Service Area effective December 8, 1997 through June 30, 1999. The letter stated that:

> ROI is in the process of shutting down operations and taking steps to allow a

transfer of participants to DLHR. An initial amount of $900,000 will be transferred to DLHR immediately. Upon completion of closeout activities the remaining balance of the [$]1,433,576, initially obligated to ROI, will be transferred to DLHR. These funds will represent the total [Program Year] funding available to DLHR. An adjustment of service levels from your initial plan will not be required until final funding.

Plaintiff responded by sending a signed modification form, dated January 29, 1998, to USDOL, which, when executed by USDOL, was intended to obligate $900,000.00 to DLHR. The plaintiff added a note of reservation of rights on the back of the modification form which asserted plaintiff's right to the full Program Year 1997 allocation for the Puerto Rico Service Area.

On February 20, 1998, Mr. DeLuca sent ROI an executed modification form to its Program Year 1997 grant agreement which returned $900,000.00 of Program Year 1997 grant funds to USDOL and changed ROI's performance period to October 1, 1997 through December 8, 1997. According to a Notice of Obligation included with the letter, the reduction left ROI with $533,576.00 in Program Year 1997 grant funds. Around March 1, 1998, however, ROI received an additional $14,445.00 from USDOL with which to pay ROI's legal fees in connection with the litigation before the ALJ filed by DLHR.

On March 2, 1998, Mr. DeLuca sent DLHR an executed modification to its Program Year 1997 grant agreement, without plaintiff's reservation of rights on the back of the form, which obligated an additional $900,000.00 in Program Year 1997 grant funds to DLHR. Accompanying the unqualified modification was a letter to DLHR from USDOL acknowledging DLHR's right to challenge the funding amount. USDOL distributed no further payments to DLHR from the Program Year 1997 allocation. ROI submitted its closeout package on June 12, 1998, indicating that it had spent the remaining $533,576.00 in Program Year 1997 grant funds obligated to it while operating and closing out the grant.

Subsequently, plaintiff attempted to obtain additional funds from USDOL. First, DLHR returned to the ALJ in an attempt to enforce its interpretation of the settlement, claiming that plaintiff is entitled to all of the Program Year 1997 allocation. *Puerto Rico, v. Herman*, No. 97–JTP–24 (USDOL Feb. 11, 1998). The ALJ, however, dismissed the enforcement case on February 11, 1998 for lack of jurisdiction. *Id.* at 2. On March 2, 1998, plaintiff filed a complaint in the United States District Court for the District of Columbia. The District Court found that it did not have jurisdiction over plaintiff's claims and transferred the case to the United States Court of Federal Claims. *Puerto Rico v. Herman*, No. 98–0535 (D.D.C. June 12, 1998) (dismissing case); *Puerto Rico v. Herman*, No. 98–0535 (D.D.C. July 23, 1998) (transferring the case to the United States Court of Federal Claims following plaintiff's motion to alter or amend judgment).

On August 31, 1999, this court denied the government's motion to dismiss for lack of jurisdiction. *Puerto Rico Dept. of Labor and Human Resources v. United States,* 44 Fed. Cl. 618 (1999). Subsequently, the parties filed cross-motions for summary judgment, together with joint stipulations of fact and a supporting appendix.

## DISCUSSION

Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the United States Court of Federal Claims (RCFC) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party must demonstrate that the moving party is entitled to judgment as a

matter of law and that there are no genuine issues of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir.1996) (*reh'g denied*); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1306 (Fed.Cir. 1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Lane Bryant, Inc. v. United States*, 35 F.3d 1570 (Fed.Cir.1994). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505. Summary judgment is appropriate when the sole dispute concerns the interpretation of a government contract, a question of law. *See Olympus Corp. v. United States*, 98 F.3d 1314, 1316 (Fed.Cir.1996).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Company v. United States*, 157 F.3d 849, 854 (Fed.Cir.1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587,

106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. at 587–88, 106 S.Ct. 1348; *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463 (Fed. Cir.1998) (*reh'g denied*); *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985). In the case of parties making cross-motions for summary judgment, each motion must be judged independently and the court must view the evidence in the light most favorable to the other party. *See Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir. 1987).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575 (Fed.Cir.1994) (*reh'g denied*); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548; *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. at 679.

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the non-moving party will need to go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

The fact that both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, does not relieve the court of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also Levine v. Fairleigh Dickinson Univ.,* 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Casualty & Sur. Co.,* 528 F.2d 1388, 1390 (2d Cir.1976). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir.1968); *Bataco Indus., Inc. v. United States,* 29 Fed.Cl. 318, 322 (1993), *aff'd,* 31 F.3d 1176 (Fed.Cir.1994). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc. v. United States,* 812 F.2d at 1391.

In the above-captioned case, the parties agree that summary judgment is appropriate and that there are no material issues of fact in dispute. Moreover, no material issues of disputed facts have been identified by the court. The parties have filed cross-motions for summary judgment which are ripe for resolution.

 The issue in this case is the interpretation of the settlement agreement entered into by the parties. A settlement agreement is a contract. *Fausto v. United States,* 16 Cl.Ct. 750, 754 (1989). The interpretation of a government contract is a matter of law. *See Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 997 (Fed.Cir.1996); *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 386–87, 351 F.2d 972, 973 (1965). The primary objective in contract interpretation is to discern the parties' intent at the time the contract was executed. *Winstar v. United States,* 64 F.3d 1531, 1540 (Fed.Cir. 1995) (citing *Arizona v. United States,* 216 Ct.Cl. 221, 234, 575 F.2d 855, 863, (1978)), *aff'd on other grounds,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The language of the "contract must be given that meaning that would be derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. at 388, 351 F.2d at 975. Moreover, words are to be given their plain and ordinary meanings. *Thanet Corp. v. United States,* 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979). In addition, a court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless. *See McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1434 (Fed.Cir. 1996), *reh'g denied,* Nov. 13, 1996; *Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985) (citing *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir.1983)). To ascertain the intentions of the parties, the contract should be construed in its entirety "so as to harmonize and give meaning to all its provisions." *Thanet Corp. v. United States,* 219 Ct.Cl. at 82, 591 F.2d at 633 (citing *ITT Arctic Servs., Inc. v. United States,* 207 Ct.Cl. 743, 751–52, 524 F.2d 680, 684 (1975); *Northwest Marine Iron Works v. United States,* 203 Ct.Cl. 629, 637, 493 F.2d 652, 657 (1974)).

 The parties contract with knowledge of the law. *See Fed. Crop Ins. Corp. v.*

*Merrill,* 332 U.S. 380, 384–85, 68 S.Ct. 1, 92 L.Ed. 10 (1947). "[T]he parties are presumed to be aware of applicable statutes and to intend to incorporate them." 24 Corbin on Contracts § 24.26, at 273 (1998). In this regard, the law becomes a part of the contemporaneous circumstances of the contract's execution and is even incorporated, without reference, into the agreement itself. *See Norfolk & Western Railway Co. v. American Train Dispatchers Ass'n,* 499 U.S. 117, 130, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991) ("Laws which subsist at the time and place of the making of a contract ... enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms."); *see also* 24 Corbin on Contracts § 24.26, at 271 (noting that rules and regulations are always considered as contemporaneous circumstances). As a result, the parties are presumed to have intended to create a valid, binding contract and the court must dismiss an interpretation which would find that the parties intended to create a contract with even a portion of the contract void. *See Torncello v. United States,* 231 Ct.Cl. 20, 27, 681 F.2d 756, 761 (1982) (citing *Arizona v. United States,* 216 Ct.Cl. at 235–36, 575 F.2d at 863); *Truong Xuan Truc v. United States,* 212 Ct.Cl. 51, 64 n. 11 (1976) (noting that a court should construe contract provisions, "if possible, to be lawful rather than unlawful" and citing *Hobbs v. McLean,* 117 U.S. 567, 576, 6 S.Ct. 870, 29 L.Ed. 940 (1886)).

■■■ When the terms of a contract are clear and unambiguous, there is no need to resort to extraneous circumstances for its interpretation. *See Sea–Land Serv., Inc. v. United States,* 213 Ct.Cl. 555, 567, 553 F.2d 651, 658 (1977), *cert. denied,* 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978). A written agreement is ambiguous when a plain reading of the contract could result in more than one reasonable interpretation. *See Metric Constructors, Inc. v. NASA,* 169 F.3d 747, 751 (Fed.Cir.1999); *Tacoma Dept. of Pub. Utils., v. United States,* 31 F.3d 1130, 1134 (Fed.Cir.1994) (citing *Hills Materials Co. v. Rice,* 982 F.2d 514, 516 (Fed.Cir.1992)). However, "[c]ourts are loathe to find ambiguity where the terms of the contract can be brought into harmony by a plain meaning interpretation rather than conflict by a

strained interpretation." *Huna Totem Corp. v. United States,* 35 Fed.Cl. 603, 611 (1996). In addition, it is not enough that the parties differ in their interpretation of the contract clause. *See Community Heating and Plumbing Co. v. Kelso,* 987 F.2d 1575, 1578 (Fed.Cir.1993). Nor may a court look to extrinsic evidence in determining whether a contract is ambiguous. *See McAbee Constr., Inc. v. United States,* 97 F.3d at 1435; *Tacoma Dep't of Pub. Utils. v. United States,* 31 F.3d at 1134 ("Outside evidence may not be brought in to create an ambiguity where the language is clear."). However, because an ambiguous or uncertain writing sometimes can only be understood upon consideration of the surrounding circumstances, extrinsic evidence will be allowed to interpret the ambiguous clause. *See Sylvania Elec. Prods., Inc. v. United States,* 458 F.2d at 1005.

■■■ In the case before the court, plaintiff claims that, based on the settlement agreement, DLHR is entitled to all of the Program Year 1997 allocation for the Puerto Rico Service Area in the amount of $2,867,153.00. There is no dispute between the parties regarding the $2,333,576.00 in Program Year 1997 funds that DLHR has already received. Therefore, the court must examine the relevant language of the settlement agreement, executed on December 8, 1997, to determine whether plaintiff is entitled to additional monies as the designated program provider from December 8, 1997 to June 30, 1998. The portion of the settlement agreement in dispute reads:

> The Department hereby agrees to unconditionally designate and fund DLHR as the only service provider for the Job Training Partnership Act Section 402 Migrant and Seasonal Farmworker Program grant for the service area of the Commonwealth of Puerto Rico for the balance of Program Year 1997 as well as Program Year 1998, ending on June 30, 1999.

In the settlement, USDOL agrees to designate and fund DLHR as the only designated service provider for the balance of Program Year 1997, from December 8, 1997 through June 30, 1998. However, no dollar figures are included in the settlement agreement nor

is any mention made in the agreement on how to calculate monies which may be due pursuant to the settlement. Because, on its face, the agreement is silent on the issue before the court, the court must look to extrinsic evidence to determine the amount of funds to which DLHR as the designated service provider for the second half of Program Year 1997 is entitled and whether US-DOL breached the agreement by transferring only $900,000.00 to DLHR.

Neither party has advanced an argument supported by the plain meaning of the contract based upon which the court can resolve the issues raised in plaintiff's complaint. The government relies in its brief on an interpretation of the contract supplemented by extrinsic evidence, not on the plain language of the settlement agreement. Plaintiff's interpretation, although offered as an interpretation based on the four corners of the agreement, also relies on extrinsic evidence.

DLHR argues that because USDOL agreed to "unconditionally" designate DLHR as the "only" service provider for the Puerto Rico service area for the balance of Program Year 1997, it is entitled to all of the Program Year 1997 allocation for the Puerto Rico Service Area, not only the first half-year allocation and the additional $900,000.00 it received after ROI was de-designated. Moreover, DLHR has argued that it suffered damages because it was forced to cut back on training and services during the 1997 Program Year. DLHR's argument implies that plaintiff did not incur expenditures respecting the Program Year 1997 funds obligated to ROI which DLHR did not receive. Also, as discussed above, the settlement agreement signed on December 8, 1997 does not state what amount of funding would be available for the time following plaintiff's designation as the only service provider.

The chronology regarding the transfer of additional monies to DLHR following the signing of the settlement agreement is as follows: DLHR was designated the service provider on January 9, 1998. On February 20, 1998, a modification was sent to ROI returning $900,000.00 in grant funds from ROI to USDOL. Modification Number 7 assigning the remaining available funds in the Program Year 1997 allocation for the Puerto Rico Service Area, to DLHR, in the amount of $900,000.00, was executed on March 2, 1998. Moreover, after December 8, 1997, the date the settlement agreement was signed, ROI continued to spend monies previously obligated to ROI and not returned to USDOL for closeout operations.

Plaintiff argues that USDOL obligated funds in quarterly installments and that the service provider for the second half of Program Year 1997 should be entitled to two quarters of the allocation, or $1,433,576.00. Plaintiff cites the two obligations made by USDOL to DLHR in the first two quarters of Program Year 1997 as the basis for its conclusion that USDOL obligated funds in quarterly installments. Plaintiff alleges that because USDOL had already allocated $1,433,576.00 to DLHR for the first half of Program Year 1997, that following the settlement agreement, DLHR was entitled to all of the remaining funds allocated to the Puerto Rico Service Area for Program Year 1997. The fact that USDOL obligated funds to DLHR for the first two quarters of the program year, however, does not appear on the face of the settlement agreement. Nor does the agreement state that USDOL will obligate funds for the program in quarterly installments.[2] Moreover, the agreement is silent on the amount of additional monies due to DLHR pursuant to the settlement.

2. Plaintiff overlooks that the parties understood that USDOL made those quarterly obligations in order to maintain services while it completed the selection process and while ROI completed a Grant Funding Plan. Furthermore, plaintiff's conclusion that JTPA funds were obligated by quarter is not correct. For example, USDOL's initial intention, as shown in Farmworker Bulletin No. 97–4, included in the joint appendix, was to fund the service provider for Program Year 1997 with a single Notice of Obligation of the entire allocation issued by USDOL prior to the program year. In addition, when USDOL designated ROI as the grant recipient for Program Year 1997, it obligated all of the funds remaining in the allocation at that time, not by quarters. Finally, following the settlement agreement, USDOL obligated $900,000.00 to DLHR for the balance of Program Year 1997, an amount greater than for one quarter.

Under the settlement agreement, DLHR was designated as the "only service provider for the Job Training Partnership Act Section 402 Migrant and Seasonal Farmworker Program grant for the service area of the Commonwealth of Puerto Rico for the balance of Program Year 1997...." Under the Section 402 Program, two separate but unequal accounts were created. *Compare* 20 C.F.R. § 633.105(a) (1997) *with* 20 C.F.R. § 633.105(b) (1997). Up to six percent of the statutory reserves for Section 402 activities was set aside in a national account for technical services and special projects. 20 C.F.R. § 633.105(a)(1). No less than ninety-four percent of the funds received for Section 402 Programs was allocated to programs in individual states, including the Commonwealth of Puerto Rico, in an equitable manner using a formula determined by USDOL. *Id.* § 633.105(b)(1); 29 C.F.R. § 97.4 (defining state as including the Commonwealth of Puerto Rico). The settlement agreement does not mention the national account. The agreement, however, does reference the Puerto Rico Service Area. Consequently, because the settlement agreement names DLHR as a Section 402 Service Provider for the Puerto Rico Service Area, by the terms of the agreement, the parties must have intended to fund DLHR with funds from the Program Year 1997 allocation for the Puerto Rico Service Area and not from the national account.

Communications between the parties in the record also evidence the understanding that the service provider for the Puerto Rico Service Area was to receive funds from the allocation for that area. First, DLHR's application to be the service provider for the Program Year 1997 grant was based on the allocation for the Puerto Rico Service Area. Plaintiff submitted the application "under the terms of competition as enumerated in the Solicitation for Grant Applications...." The Solicitation for Grant Applications stated that applicants for Section 402 Grants were to base their applications on the proposed allo-

cation for the Puerto Rico Service Area.[3] In addition, when DLHR appealed the Grant Officer's decision not to select it as the Puerto Rico Service Provider to the ALJ, it requested the funds allocated for the Puerto Rico Service Area. The settlement agreement derived from and resolved that appeal. Even DLHR's complaint requested that the ALJ "[o]rder the defendants to award the plaintiff [DLHR] Section 402 funds for service area Puerto Rico for Program Year 1997...." Finally, when defendant extended DLHR's Program Year 1996 grant service into Program Year 1997, it obligated funds to DLHR from the Program Year 1997 allocation. Thus, the evidence demonstrates that DLHR and USDOL have consistently acted in the belief that the service provider for the Program Year 1997 grant for the Puerto Rico Service Area would be funded out of the yearly allocation for that area.

At the time the parties actually executed the settlement agreement on December 8, 1997, there were no funds left in the Program Year 1997 allocation for the Puerto Rico Service Area. Half of the program year allocation had been obligated to DLHR as an extension of DLHR's grant for Program Year 1996, pending selection and approval of ROI's Grant Funding Plan, and the other half had been obligated to ROI. Because the Puerto Rico Service Area allocation was the source of funding for the program, once the settlement agreement was signed, in order to further fund DLHR, it was necessary for USDOL to reduce the funds obligated to ROI in order to make additional money available to DLHR. This was accomplished by a modification, signed by the USDOL grant officer on February 20, 1998, which returned $900,000.00 from ROI to USDOL and changed the grant period for ROI to October 1, 1997 through December 8, 1997. With the modification which returned $900,000.00 to USDOL, $533,576.00 remained obligated to ROI. The $900,00.00 subsequently available in Puerto Rico Service Area Program Year 1997 funds was obligated to DLHR on March

---

**3.** The proposed allocation levels stated in the Solicitation for Grant Applications were set at the same rate as the Program Year 1996 allocations. *See* Job Training Partnership Act: Migrant and Seasonal Farmworker Programs; Ap-

plication of Waiver Provision, and Solicitation for Grant Application, 62 Fed.Reg. 6272, 6273. Ultimately, USDOL decided to use the same allocation level in Program Year 1997 as in Program Year 1996.

2, 1998. As described below, applicable regulations appear to have allowed USDOL to use its discretion to determine the quantity of funds ROI was required to return as a de-designated service provider.

ROI was designated as the service provider from October 1, 1997 to December 8, 1997 during Program Year 1997. On the same day DLHR and USDOL executed the settlement agreement, December 8, 1997, ROI sent a letter to USDOL withdrawing its application for funding. Up until the time ROI was de-designated, ROI was entitled to receive funds from USDOL for allowable expenditures as a grantee. *See* 20 C.F.R. § 633.104, 633.303. ROI also could expend funds after it was de-designated, during closeout procedures. *See* 29 C.F.R. 95.71(c).[4] The fact that DLHR appealed USDOL's selection of ROI did not immediately affect ROI's entitlement or impair ROI's funding. *Id.* § 633.205(e). Furthermore, "[a]ny organization selected and/or funded prior to the ALJ's decision will be affected in a manner prescribed by the Department. All parties will agree to the provisions of this paragraph as a condition for funding." *Id.* § 633.205(e). In addition, the regulations applicable to grantees, to which plaintiff agreed to be bound as a condition of funding, placed the treatment of a service provider, whether plaintiff or ROI, following an ALJ's decision, within the discretion of USDOL.

Plaintiff argues that USDOL distributed funds over and above the Puerto Rico Service Area for Program Year 1997 allocation to ROI and DLHR. Plaintiff cites the $14,445.00 USDOL gave to ROI on or about March 1, 1998 in order to pay ROI's legal fees in connection with the litigation filed by DLHR as an example of the availability of additional funds. According to DLHR, this fact evidences the parties' belief that they were not restricted by the allocation when they entered into the settlement agreement. DLHR also argues that under 20 C.F.R. § 633.317, USDOL could obtain additional funds through "reallocations." Pursuant to 20 C.F.R. § 633.317 funds are available only after USDOL "reduce[s] a portion of a grant when it can be reasonably projected that the funds will not be used during the grant performance period or that they will not be used for DOL authorized carryover purposes." *Id.* § 633.317(a). This occurs in a "limited number of circumstances." *Id.* The funds "recaptured" from this procedure are then distributed at the discretion of USDOL. 20 C.F.R. § 633.317(b). There is no evidence, however, that any funds had been recaptured and were available through reallocation in Program Year 1997. Although it is not clear from which source ROI was paid for its legal expenses, without evidence of the availability of additional funds, and given the silence of the settlement agreement and the record on the subject, this court cannot find that the parties intended to fund DLHR through sources other than the Program Year 1997 allocation for the Puerto Rico Service Area. Moreover, the court cannot take into account the $14,445.00 USDOL gave to ROI because the payment to ROI was made on March 1, 1998, after the settlement agreement was entered into by the parties.

The practical conduct of the parties after a dispute arises is irrelevant in determining the intent of the parties to contract. *See Met–Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 687 (Fed.Cir.1986) (citing *Dynamics Corp. v. United States*, 182 Ct.Cl. 62, 73, 389 F.2d 424, 430 (1968)). Therefore, in determining the intention of the parties when they entered into the settlement agreement on December 8, 1997, an action undertaken by USDOL which occurred after the dispute arose and which may have caused the allocation of funds to exceed the allocation to

---

4. According to 20 C.F.R. § 633.316, "[g]rant closeout will conform to the requirements at 41 CFR part 29–70." Title 41 of the Code of Federal Regulations, published on July 1, 1997, is organized in chapters and begins at chapter fifty. Chapters one through forty-nine of Title 41 were replaced by the Federal Acquisition Regulations on September 19, 1983. *See* 41 C.F.R. Subtitle A, Editorial Note. Chapter fifty of Title 41 does relate to the Department of Labor, but only provides general regulations not applicable here. 41 C.F.R. 50. The Solicitation for Grant Application, however, does state that "[n]onprofit organizations must conform to Administrative Regulations at 29 C.F.R. part 95." Job Training Partnership Act: Migrant and Seasonal Farmworker Programs; Application of Waiver Provision, and Solicitation for Grant Application, 62 Fed.Reg. at 6273. Therefore, 29 C.F.R. 95.71(c) is applicable.

the Puerto Rico Service Area cannot be used to demonstrate a common intent at the time the agreement was entered into by the parties.

The dispute at issue in the instant case began in January of 1998. On January 9, 1998, USDOL sent a letter to DLHR which stated that $900,000.00 would be obligated to DLHR shortly, but that DLHR's ultimate level of funding would be reduced by ROI's closeout expenditures. Plaintiff responded by sending to USDOL a signed modification form, dated January 29, 1998, which, when executed by the defendant, was intended to obligate $900,000.00 to DLHR. The plaintiff added a note of reservation of rights on the back of the modification form it sent to US-DOL, which asserted plaintiff's rights to the full Program Year 1997 allocation for the Puerto Rico Service Area. After exchanges of correspondence, on March 2, 1998, USDOL signed a copy of the modification obligating the $900,000.00 to DLHR without the plaintiff's note of reservation of rights. Accompanying the unqualified modification was a letter to DLHR from USDOL acknowledging DLHR's right to challenge the total funding amount. Therefore, the dispute arose no later than January 29, 1998 and the transfer of $14,445.00 to ROI to cover ROI's legal fees, which resulted in USDOL apparently exceeding the Puerto Rico Service Area allocation for Program Year 1997, occurred after the dispute between the parties arose and should not be considered in interpreting the settlement agreement.

After reviewing the words of the settlement agreement, the applicable laws and regulations, and the record before the court, the court finds that the settlement agreement between the parties did not alter USDOL's normal procedures requiring that the designated provider for the Section 402 Program should be funded out of the Program Year 1997 allocation for the Puerto Rico Service Area. At the time of the settlement agreement, all of the funds from the allocation for Puerto Rico had been obligated, half to ROI and half to DLHR. In its discretion, USDOL withdrew $900,000.00 from the monies obligated to ROI, and re-obligated this amount to DLHR. USDOL opted, also in its discre-

tion, to allow ROI to use the remaining $533,576.00 obligated to ROI for expenses incurred either to carry out or closeout the grant. Neither the settlement agreement nor any applicable statute or regulation required USDOL to increase the funding available for the Puerto Rico Service Area in Program Year 1997 beyond the $2,867,153.00 allocation.

Plaintiff further argues that if the court concludes that DLHR's funding could be reduced by the monies obligated to ROI, it must be allowed to challenge ROI's expenditures as not permissible under the JTPA rules and regulations. Plaintiff contends that because the parties dispute the material facts at issue with regard to such a claim, the issue cannot be decided on summary judgment. Plaintiff, however, cannot challenge ROI's expenditures in the United States Court of Federal Claims. The process for challenging the allowability of costs claimed by a service provider is specifically set out in the Code of Federal Regulations and does not include proceedings in the Court of Federal Claims. As the United States Court of Appeals for the Fourth Circuit has observed, "[t]he Act [29 U.S.C. § 1554, the JTPA] confers on the Secretary of Labor broad authority to monitor training programs and to take appropriate action to assure compliance with the law." *New Beckley Mining Corp. v. Int'l Union*, 18 F.3d 1161, 1166 (4th Cir.1994) (citing 29 U.S.C. §§ 1554, 1573, 1574). Pursuant to that grant of authority, the Secretary of Labor has promulgated regulations creating an extensive grievance process. *See* 20 C.F.R. § 636; *Am. Fed'n of State, County and Mun. Employees v. Private Indus. Council*, 942 F.2d 376, 380 (6th Cir.1991) ("[t]he JTPA has a comprehensive administrative procedure for addressing complaints and grievances.").

An investigation into the costs claimed by a grantee may be initiated by the USDOL on its own or by any person or organization. 20 C.F.R. § 636.1(b). The first level of review is conducted by the grantee which is required to establish and maintain procedures for resolving any allegation that the grantee violated the JTPA or its enacting regulations. *Id.* at §§ 636.3(a)(1), 636.5. The grantee is

required to allow the complainant to file a written complaint and the complainant may request a hearing at which legal counsel may call witnesses and introduce documentary evidence. *Id.* at § 636.3(b). The complainant may receive all relevant records and documents kept by the grantee, and the grantee is required to issue a written decision. *Id.* at § 636.3(c). A complainant may proceed directly to the USDOL, however, when the grantee has not acted within sixty days of the complaint, or when the grantee does not have the requisite procedures in place, or an emergency situation exists. *Id.* § 636.5(b).

When the USDOL grant officer receives the complaint, he or she is required to commence an investigation and deliver a written conclusion within 120 days. *Id.* § 636.6(c). If the parties cannot come to an agreement following the grant officer's conclusion, he or she is required to issue a final, written decision. *Id.* § 636.8(e). The complainant may appeal the decision to an ALJ. *Id.* § 636.10(a). The ALJ's decision is reviewed by the Secretary whose conclusion is considered the final agency action. *Id.* § 636.11. Judicial review of the final agency action is established in the United States Court of Appeals for the Circuit in which the affected parties reside or transact business. *Id.* § 636.1(a). Pursuant to these regulations, an organization may challenge the allowability of costs claimed by a grantee, but must first exhaust its administrative remedies. *See JCM, Ltd. v. U.S.*, 210 F.3d 1357, 1359 (Fed. Cir.2000) (" 'The doctrine of exhaustion of administrative remedies ... provides "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." ' ") (quoting *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969)). Based upon the record before this court, the plaintiff has not challenged ROI's expenditures at USDOL and, therefore, has not exhausted its administrative remedies. If plaintiff had exhausted its administrative remedies and challenged ROI's expenditures, it could have appealed an unfavorable decision to the United States Court of Appeals for the appropriate Circuit, not to the United States Court of Federal Claims. Certainly, the plaintiff, which has been a longtime grantee under the program, was aware of the applicable procedures.

## CONCLUSION

The settlement agreement, entered into by the parties on December 8, 1997, required USDOL to designate and fund DLHR as the only service provider during the balance of Program Year 1997 for the Puerto Rico Service Area. After returning $900,000.00 to USDOL from the amount previously obligated to ROI, the government re-obligated these same grant monies to DLHR. In its discretion, USDOL allowed ROI to retain $533,576.00 for work performed and closeout costs. Moreover, this court is without jurisdiction to review ROI's expenditures as that responsibility is assigned, by regulation, to the grantee, the grant officer, the Office of ALJs at USDOL and the appropriate Federal Circuit Courts of Appeal governing the region in question. Based on the record filed with the court, this court concludes that USDOL did not act improperly.

The plaintiff's motion for summary judgment is **DENIED**. The defendant's motion for summary judgment is **GRANTED**. The Clerk of the Court is directed to enter judgment in favor of the defendant. Each party shall bear its own costs.

**IT IS SO ORDERED.**

